**UNITED STATES of America ex rel. Anthony PERPIGLIA**

v.

**Alfred T. RUNDLE, Warden State Correctional Institution, Philadelphia, Pennsylvania.**

**Misc. No. 2495.**

United States District Court E. D. Pennsylvania.

Sept. 25, 1963.

Paul Leo McSorley and John F. X. Purcell, Philadelphia, Pa., for petitioner *

Gordon Gelfond, Asst. Dist. Atty., for Commonwealth of Pennsylvania.

FREEDMAN, District Judge.

This is a habeas corpus proceeding in which petitioner attacks his pleas of guilty and the sentence imposed thereon in a State court.

## I

Petitioner was represented by counsel when he pleaded guilty on July 30, 1947, before Judge Harry S. McDevitt in the Court of Quarter Sessions of the Peace of Philadelphia County to five bills of indictment, charging burglary, larceny, robbery, receiving stolen goods and aggravated assault and battery with intent to kill. On September 4, 1947, he was sentenced by Judge McDevitt to imprisonment for terms aggregating 50 to 100 years.

After serving nine years in the Eastern State Penitentiary petitioner obtained a commutation of his sentence by the Governor and was released on December 14, 1956.[1]

Less than six months later petitioner was arrested for similar offenses committed in the short period of his freedom. He was convicted of these offenses by a jury after a plea of not guilty and on June 11, 1958, he was sentenced by Judge Eugene V. Alessandroni to imprisonment for a term of 10 to 20 years on the charge of attempted burglary and a term of $3\frac{1}{2}$ to 7 years on the charge of assault and battery with intent to kill, the sentences to run consecutively from the expiration of the earlier, commuted sentences. The Pennsylvania Board of Parole thereupon ordered him recommitted for violation of parole and he is now confined pursuant to the order of recommitment. The maximum term of imprisonment on the sentences imposed by Judge McDevitt will not expire until January 14, 2049. On their expiration petitioner will be required to serve the sentences imposed by Judge Alessandroni, which total a minimum of $13\frac{1}{2}$ years and a maximum of 27 years. The convictions before Judge Alessandroni were attacked by a petition for a writ of error coram nobis filed by the defendant in 1959. A hearing on the writ of error coram nobis apparently was held in November 1959, but no decision has yet been rendered.[2]

In 1960 petitioner challenged the sentences imposed by Judge McDevitt by a petition for habeas corpus in the State courts. The Court of Quarter Sessions, apparently without a hearing, dismissed the petition. Commonwealth ex rel. Perpiglia v. Banmiller, 25 D. & C.2d 318 (1961). The Superior Court of Pennsylvania affirmed in a per curiam opinion. Commonwealth ex rel. Perpiglia v. Ban-

* Mr. McSorley was appointed by the Court from the Federal Defense Panel to represent petitioner, and Mr. Purcell assisted him. They have the thanks of the Court for their volunteer services.

1. The commutation by the Governor, dated November 13, 1956, commuted the minimum sentence to 9 years and 4 months, expiring on November 17, 1956, but apparently the prisoner was not released until December 14, 1956.

2. See Commonwealth's Exhibit 3; N.T. 45, 103, 240–244.

miller, 196 Pa.Super. 311, 175 A.2d 334 (1961). The Supreme Court of Pennsylvania refused an allocator, 197 Pa.Super. xxxi, and certiorari was denied by the Supreme Court of the United States. Perpiglia v. Banmiller, 371 U.S. 894, 83 S.Ct. 193, 9 L.Ed.2d 126 (1926). Petitioner has plainly exhausted his available State court remedies.

## II

Petitioner's basic claim is that his pleas of guilty and his confessions which preceded them were coerced by the police and that his conviction therefore was obtained in violation of the Due Process Clause of the Fourteenth Amendment.

The Commonwealth would have us disregard the circumstances surrounding the confessions and pleas because of the general principle that a plea of guilty made with the advice of counsel bars a subsequent claim on habeas corpus that the evidence against the defendant was illegally obtained. See United States v. Gallagher, 183 F.2d 342, 344 (3d Cir. 1950), cert. den. 340 U.S. 913, 71 S.Ct. 283, 95 L.Ed. 659 (1951); Broadus v. Lowry, 245 F.2d 304 (6th Cir. 1957), cert. den. 355 U.S. 858, 78 S.Ct. 88, 2 L.Ed.2d 65.

A plea of guilty forecloses a defense, but it does not seal off subsequent inquiry whether the plea itself was freely and voluntarily entered. Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942). The question in such a case is not the guilt or innocence of the defendant, but rather the voluntariness of his plea. Kercheval v. United States, 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). On this issue the details of his detention and confession are relevant. United States v. Morin, 265 F.2d 241, 245 (3d Cir. 1949). See also Com. of Pa. ex rel. Herman v. Claudy, 350 U.S. 116, 118, 122, 76 S.Ct. 223, 100 L.Ed. 126 (1956). Even the explicit avowal by a defendant in open court that his plea of guilty was not coerced does not foreclose inquiry as to its voluntariness, although

it is, of course, evidential on the issue. United States ex rel. McGrath v. La Vallee, 319 F.2d 308 (2d Cir. 1963); United States v. Tateo, 214 F.Supp. 560, 564 (S.D.N.Y.1963).

We must, therefore, make a broad inquiry into the "totality of the circumstances" (See Fikes v. Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)) preceding the petitioner's guilty plea. And in so doing we must not permit the probable truth or falsity of his confessions to cloud the inquiry whether the law enforcement officials of the State by their conduct brought about confessions which were not freely self-determined. Rogers v. Richmond, 365 U.S. 534, 543–544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961).

## III

Some time in April or May of 1947 [3] petitioner, who was then 20 years of age, was sentenced by Judge Curtis Bok in the Court of Quarter Sessions of Philadelphia County to the Pennsylvania Industrial School at Camp Hill for an indefinite period after a plea of guilty to a charge of attempted burglary. On June 19, 1947, while he was so confined, Detectives Driscoll and Cammittee of the Philadelphia police obtained custody of him on the authority of a writ of habeas corpus issued earlier that day by Judge McDevitt. The writ commanded the Superintendent of the Pennsylvania Industrial School to produce the body of Perpiglia in the Court of Quarter Sessions, Room 453, City Hall, Philadelphia, on the following day, June 20th. Detective Driscoll signed a receipt for the body of the petitioner in which it is recited that his delivery had been required by a writ of habeas corpus ad testificandum, and that he was to be safely kept and returned to the Pennsylvania Industrial School "in due season". (Petitioner's Exhibit 3.)

Detectives Driscoll and Cammittee did not bring the prisoner before the Court

3. The petition fixes the date as April 4, 1947; Rundle's answer, ¶ 2, specifies

May 20, 1947, and the Exhibits give various dates.

of Quarter Sessions on June 20th, nor was he produced before any other tribunal for the purpose of testifying. Instead, when they arrived in Philadelphia with their prisoner on June 19, 1947, the two detectives lodged him in the cellblock of the Central Police Station in City Hall. For the next seven or eight days he remained there without being brought before a judge or given a hearing before a magistrate and without any charges being preferred against him. In the cellblock were confined many other suspects who were undergoing questioning by the detectives. Petitioner was subjected daily and at all hours to questioning regarding his participation in a great number of robberies and burglaries of which he was suspected. Frequently the detectives confronted him with implicating statements of other suspects and urged him to confess.

The office of Detective Driscoll, who apparently was in charge of the investigation under Superintendent Richardson, adjoined the cellblock. The inmates therefore were peculiarly subject to his immediate control. He and his associates had complete freedom of entry at any time during the day or night. The cellblock itself was intended for the briefest custody. It lacked most of the bare amenities of a prison. There were no beds and the prisoners slept either on cots or on the floor. There were no recreational facilities, no adequate opportunity for exercise, and sanitation facilities were meagre.

After seven or eight days petitioner, who had been kept from communicating with his family and was without counsel, signed a confession admitting his participation in a robbery. He was then promptly brought before a magistrate in Central Police Court in City Hall. The magistrate, after hearing testimony of Detective Driscoll regarding the robbery

and considering the statement signed by the petitioner, held him without bail and committed him to the Philadelphia County Prison to await the action of the Grand Jury.

Petitioner, however, was never transferred to the County Prison to which he was committed. Instead, the police continued to keep him as their prisoner in the Central Police Station, where he remained until his sentence on September 4, 1947, with one interruption on July 30, 1947, when he was arraigned.

After the hearing before the magistrate petitioner's mother was permitted to visit him. He urged her to retain counsel for him, and she ultimately obtained the services of Martin G. Stein, Esquire, a Philadelphia lawyer who is now deceased.

On July 30, 1947, petitioner was arraigned along with 20 other defendants before Judge McDevitt on many bills of indictment. The transcript of the proceeding notes Mr. Stein's presence on behalf of the petitioner, although the petitioner testified that he did not see him there. The transcript does not show the entry of pleas at that time, but it is agreed on all sides that it was at this hearing that petitioner pleaded guilty to the five bills of indictment on which he was subsequently sentenced.[4]

After the entry of his pleas on July 30, 1947, petitioner was again returned to confinement by the Philadelphia police in the Central Police Station in City Hall. His questioning continued there from that time until September 4, 1947, when he and many other defendants were brought before Judge McDevitt for sentencing. Much has been said before me regarding the relatively brief discussion which preceded the sentencing of petitioner on September 4, 1947. The transcript of that date (pp. 41–43) shows that many defendants were being sentenced

---

4. The transcript of September 4th (p. 46) shows (in another case) that pleas of guilty had been taken by Judge McDevitt on July 30th.

While the record is not clear, it seems that there were 38 bills of indictment

against petitioner, and that although he was later sentenced on five, he pleaded guilty to many more. It is admitted that he pleaded not guilty to one indictment.

after brief statements by them or their counsel. When petitioner's case was called the following occurred:.

"MR. STEIN: This defendant has been charged with robbery and burglary. He pleaded guilty to all the charges, 26 altogether. They were all committed—this is the peculiar part of it—in a period of five months, from October, 1946, to the early part of April, 1947. There is very little can be said for him because he has squandered his ill-gotten gain, and no one profited from it, not even himself. He has been previously arrested.

"BY MR. STEIN: (Addressing the defendant)

"Q How old are you?

"A 20.

"Q You were arrested before this?

"A Yes, sir.

"Q When?

"THE COURT: 1944, when he was a juvenile, assault and battery, threat to do bodily harm.

"1944, larceny of an automobile, operating without the owner's consent. Sent to the Municipal Court and sent home. That is why he is here today.

"1947, burglary. Some he pleaded guilty to.

"1947, pleaded guilty, sent to White Hill. Burglary.

"1947, violation of the Firearm Act.

"1944, burglary, larceny of an automobile. Municipal Court and sent home.

"1944, burglary, and sent to the County Prison.

"1947, larceny of an automobile.

"1944, larceny of an automobile, again the Municipal Court.

"MR. STEIN: When he was in White Hill all these other charges were discovered. He is now under sentence to White Hill.

"SUPERINTENDENT RICHARDSON: This man here is one of the worst criminals we have had to contend with since we had Stinger. He is so mean he even cheated his own crowd. They got $2200. and he told his associates he only got $600. He is the fellow that always had a gun in his possession, and broke up the gun and got rid of it because he thought they would be—the evidence would be discovered from previous shootings that took place. This fellow didn't give us any cooperation at all. The only thing he would admit, when he was boxed with the rest of the defendants he admitted his part. He hasn't even scratched the surface on what he done.

"THE COURT: You say the worst since Stinger?

"SUPERINTENDENT RICHARDSON: Yes, sir. He is a cold-blooded criminal at the age of 20.

"THE COURT: Fifty to one hundred in the Penitentiary."

The formal sentence was divided into five sentences of 10 to 20 years each, to run consecutively.

## IV

█ Petitioner claims that while he was detained in the custody of the police he was repeatedly subjected to beatings and threats of additional violence if he did not confess. He claims that the police told him that Judge McDevitt would follow whatever recommendations Superintendent Richardson would make as to sentence and that he was urged to plead guilty in order not to offend the police and through them, the Judge.

There was indeed opportunity for abuse of power in the unlimited control which the detectives exercised over the petitioner, unchecked as it was by any fear of judicial supervision or interference. In these circumstances the police must have been under a strong temptation to express their frustration when petitioner refused to confess, and violence

of some kind as the spontaneous result of defying them would not have been too remote a possibility. I find, however, that petitioner has not met the burden of proof of his claim of physical violence. He testified to acts of violence, but I do not feel justified in relying on his testimony in this regard. It was too vague for one who had suffered the beatings he claimed and I do not accept it or the inadequate efforts at corroboration by his mother and his witness Schiavo, especially over the positive denials by Detective Driscoll.[5]

### V

█ The finding that there was no physical violence does not end our inquiry. For the Supreme Court has made it clear that "coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition * * * [and] that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.' A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). See also Reck v. Pate, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Spano v. New York, 360 U.S. 315, 323–324, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

█ The first confession which the petitioner made seven or eight days after the police took him into their custody was the product of coercion. He had every right to believe that the police had the power and authority of the Judge behind them, for it was the Judge's signature on the writ of habeas corpus which had placed him in their hands. Their power over the prisoner was so great that they were free to deny him the most elementary rights unless he first acknowledged his guilt. During this time he was without benefit of counsel; and only after he had confessed was he permitted to communicate with his mother and, through her, to secure the assistance of counsel. The power of the police was made clear to him by their failure to schedule a hearing before a magistrate until after he had confessed. Their continued power is shown by their retention of custody over him after the magistrate had committed him to the County Prison. I reject the explanation by Detective Driscoll that the prisoner preferred the police cell-block to the County Prison because it was more convenient for visitors. It is unlikely that they disregarded the commitment out of sensitivity to a supposed preference of the prisoner. In any event, it was their duty to obey the magistrate's order of commitment. Their continued detention of him shows that their domination was unchanged after the magistrate's hearing.

The custody of the petitioner by the police continued throughout a 77-day period. Even after he had pleaded guilty he continued to be their prisoner rather than a citizen awaiting sentence. It must have appeared to the petitioner that he was alone, powerless, friendless and unaided. He had no rights except those which the police were willing to grant. In the circumstances, physical coercion must have hung over the prisoner as an ever present, even if unspoken, threat. The circumstances, even without physical violence, offend against the most elementary conceptions of the rule of law and the freedom of the individual. They present an ugly parallel to the subjection of the individual to the power of the State in totalitarian regimes.

█ I find that the confessions secured by the police both before and after the magistrate's hearing were the product of coercion.

█ It was in the shadow of this background of effective police coercion that the pleas of guilty were made. Such

5. Detective Cammittee was unavailable as a witness and so, by reason of illness, was Superintendent Richardson.

a plea, secured by coercion, even though the defendant is represented by counsel, is subject to attack on habeas corpus. Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942).

It is the duty of the court in every case to exercise care that a plea of guilty is voluntarily made and if it is later shown to have been unfairly obtained, or given through ignorance, fear or inadvertence, it will be set aside. The language of Mr. Justice Butler in Kercheval v. United States, 274 U.S. 220, 223–224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927), is now a classic statement of the principle:

"Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences. When one so pleads he may be held bound. * * * But, on timely application, the court will vacate a plea of guilty shown to have been unfairly obtained or given through ignorance, fear or inadvertence." [6]

Here the arraignment Judge was under a special obligation to inquire affirmatively into the voluntariness of the plea, since he himself had set in motion the events which produced the coerced confessions. It does not matter whether Judge McDevitt actually was aware of what transpired between the police and the petitioner regarding his confessions or their threats that they had it in their power to have a severe sentence imposed if he did not cooperate with them. Viewing the circumstances, as one must, from the humble perspective of the defendant, who had been taken into custody by the authority of the Judge and then coerced into confessing, it would require a disregard of everyday reality to believe that he made his plea of guilty voluntarily when he tendered it to the same Judge, who thereupon accepted it without question. Affirmative inquiry by the Judge in an unclouded atmosphere, free from any prior linkage with the police, might well have revealed the lack of freedom which surrounded the plea of guilty. A formal impartiality was not enough, in these circumstances, to undo the impressions made on the prisoner by what had gone before.

I find that the petitioner and his counsel were driven to the pleas of guilty by the totality of the circumstances from the time he was taken into custody on the writ of habeas corpus until he appeared before Judge McDevitt and entered his pleas of guilty. He was coerced by the pressure of the police and by their assumption of authority over him which justified the belief by him and his counsel that he had no alternative but to plead guilty.

It is lamentable that this train of abuses was begun by a writ of habeas corpus issued under the authority of the early Act of February 18, 1785, 2 Smith's Laws 275, § 1, 12 P.S. §§ 1871–1873.[7] An Act which, as its title indicates,[8] was intended to prevent wrongful imprisonment and to secure the personal liberty of individuals[9] was instead employed as a weapon to secure the illegal confinement of a

6. See Machibroda v. United States, 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed. 2d 473 (1962); Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942); United States ex rel. McGrath v. La Vallee, 319 F.2d 308, 311 (2d Cir. 1962); United States v. Morin, 265 F.2d 241, 245 (3d Cir. 1959); United States ex rel. Jackson v. Rundle, 219 F.Supp. 538 (E.D.Pa.1963).

7 The statutory legend on the writ, "By Act of Assembly one thousand seven hundred and eighty-five", its terms, and its signature by the Judge make it clear that it was issued under the Act of 1785.

We need not, therefore, concern ourselves with the fullest reaches of the common law writ of habeas corpus as distinguished from the statutory writ under the Act of 1785. See e. g. 3 Blackstone's Commentaries * 129–35; Williamson v. Lewis, 39 Pa. 9 (1861); Commonwealth ex rel. Levine v. Fair, 394 Pa. 262, 278 (1958); Commonwealth v. Gibbons, 9 Pa.Super. 527 (1899).

8. The Act is entitled "An ACT for the better securing personal liberty, and preventing wrongful imprisonments."

9. The Act provides "that if any person shall be or stand committed or detained

suspect. The Act was perverted into a warrant for inquisitorial practices, despite its purpose, recited in its preamble, to redress wrongful restraints.[10]

Such abuse of the great writ for the protection of liberty was, according to the candid testimony of Dectective Driscoll, a widespread practice at the time. This indicates the climate which surrounded petitioner and in which his counsel was called upon to act on his behalf.

The Commonwealth contends that petitioner was sufficiently protected by the presence of counsel. Petitioner answers this by the claim that Mr. Stein was so inadequate in representing him that for all practical purposes he was no better off than he would have been without counsel.

■ Even if the recently announced principle of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), is applicable to this proceeding, which occurred in a State court 16 years ago,[11] the record does not justify a finding that Mr. Stein's representation of petitioner was so inadequate that he was in effect denied the assistance of counsel.

Mr. Stein was brought into the case only after the police no longer feared a lawyer's presence. They had by that time extracted confessions from petitioner and felt free to bring him before a magistrate. Even after Mr. Stein visited the petitioner in the police cellblock the police continued to keep him in confinement and at their beck and call for interrogation. They obtained additional confessions from him in this later period as a result of repeated questioning and confrontation with other suspects. Faced with his client's numerous confessions and acknowledgments that he had participated in a series of crimes, some of which he was unable to recall, Mr. Stein was placed in an extremely difficult position. If he had sought the petitioner's transfer from the custody of the police to the County Prison he undoubtedly would have offended them. If he had sought petitioner's release from detention he would have succeeded at best in having him returned to the Pennsylvania Industrial School. In either case, since the petitioner had been delivered to the police by the authority of Judge McDevitt, Mr. Stein had every right to believe that the same authority would have been asserted once again. Moreover, he would have run the risk of offending the Judge by his very success. Indeed, in these circumstances a plea of not guilty might well have seemed an act of defiance of the police, likely to offend the Judge as an arbitrary impediment to a swift sentence where guilt had already been ac-

---

for any criminal or supposed criminal matter * * *, it shall and may be lawful to and *for the person so committed or detained, or any one on his or her behalf*, to appeal or complain to any Judge * * *". The Judge is authorized to award and grant the writ "directed to the person * * * in whose custody the prisoner is detained, returnable immediately before the said Judge * * *." The officer, sheriff, gaoler, keeper or other person to whom the writ is directed is required to "make return of such writ, and bring or cause to be brought the body of the prisoner unto or before the Judge * * *, before whom the said writ is made returnable, and, in case of his absence, before any other of the Judges * * * aforesaid, and shall then likewise specifically and fully certify the true cause or causes of the commitment and detainer of the said prisoner * * *:

And thereupon the Judge * * * before whom the prisoner shall be so brought, shall within two days discharge the prisoner from imprisonment, taking his or her appearance at the next court of Oyer and Terminer, General Gaol Delivery, or General Quarter Sessions * * * unless it shall appear to the said Judge * * *, that the party so committed is detained upon legal process, order or warrant", etc.

10. The preamble reads: "WHEREAS personal liberty is a principal blessing derived from free constitutions of government, and certain methods of proceeding should be prescribed, so that all wrongful restraints thereof may be easily and speedily redressed: Be it therefore enacted"—, etc.

11. See United States ex rel. Craig v. Myers, 220 F.Supp. 762 (E.D.Pa.1963).

knowledged. It would be unfair to Mr. Stein not to recall that at the time he represented the petitioner the rights of an accused were more summarily dealt with than they are today. Mr. Stein should not be declared professionally incompetent because he did not contend against the conduct of the police and the Judge with the freedom which only in recent years has come to be generally acceptable. He was acting at a time when it was widely held that the ascertainment of the guilt of the prisoner was more important than the means by which it had been achieved.

I find that Mr. Stein was not inadequate in his representation of petitioner or in his advice that he plead guilty. I find, however, that notwithstanding the assistance of counsel, petitioner's pleas of guilty were the direct product of coercion by the police, initiated by an abuse of process sanctioned by the Judge who ultimately sentenced him. The pleas are therefore invalid under the Due Process Clause of the Fourteenth Amendment.

## VI

Since I find the pleas of guilty invalid because of coercion, I shall deal only briefly with the claims petitioner makes regarding the duration of the sentence.[12]

The sentence was severe, even though for a man so young the petitioner had already committed a good many acts of armed violence, such as burglary and robbery.[13]

Indeed, it appears that the sentencing Judge himself did not intend that the petitioner would serve out even the minimum term. Mr. Stein's affidavit states that he called upon the Judge immediately after the sentence and was assured that he would facilitate the granting of parole after petitioner had served six or seven years. Whatever may be thought of such a practice, it cannot serve to make the sentence invalid when it was entered.

Even in the light of the Judge's intention that petitioner's imprisonment would end in six or seven years, the sentences totalling 50 to 100 years are not subject to modification or invalidation on habeas corpus because they may appear to me unduly harsh. It is not my function, nor is it within my power, to review the appropriateness of the punishment to fit the crime or the criminal. The question is being debated even now whether appellate review should be provided to remedy widespread disparities in sentence. Such a remedy, however, does not now exist in Pennsylvania or in the Federal courts, and it certainly is not available on habeas corpus. "The sentence being within the limits set by the statute, its severity would not be grounds

---

12. The Commonwealth concedes that the sentence on Bill No. 9, September Sessions 1947, was illegal because it exceeded the statutory maximum. It would undoubtedly be corrected on application to the State court.

13. As late as his 1956 petition for commutation (Commonwealth's Exhibit 1), in which complaint is made of the validity of the pleas of guilty and the sentence as well as the inadequacy of his former counsel, he states: "In the Fall of 1946, at the age of 17, I became involved with a group of young men and men who, without any definite planning, from time to time set out in small groups and broke into stores or warehouses which seemed likely to contain money. There was no organization, and the persons who went along were simply those who by chance happened to be on the corner and went along. Some of the group scarcely knew others in the group. From the Fall of 1946 to April of 1947, a long series of burglaries resulted. * * * " (¶15(a)).

"Looking back it seems incredible to me that with my fine parents I allowed myself to be led into such juvenile misdemeanors. Before I knew it I was looked upon as incorrigible. The offenses in which I took part from the Fall of 1946 until the Spring of 1947, constitute an almost continuous 'spree' in which there seems to have been completely absent any sense of moral obligation to the community, really, an absence of any common sense at all. When I was arrested and sent to White Hill, I had made up my mind that I was fortunate in having that 'spree' cut short and resolved never to get in trouble." (¶17).

for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus." Townsend v. Burke, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948).

Related to the criticism of the length of the sentence is the petitioner's claim that the Judge in narrating his earlier criminal record inadvertently included one of the offenses for which he was then being sentenced. (See Transcript of September 4, 1947, p. 42.)

The Judge's error does not have the full significance of the action of the sentencing judge in Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). There the judge taunted and mocked the defendant's claim of innocence of prior offenses, when in fact the defendant spoke the truth and had actually been acquitted. The defendant did not have the benefit of counsel nor was he advised of his right to counsel. He had pleaded guilty and stood alone before the judge for sentence. The Supreme Court set aside the sentence on habeas corpus.[14]

In the present case, the Judge's reference to the current offense as part of the past criminal record occurred in the presence of defendant's counsel; the defendant had pleaded guilty to the offense which was mentioned as an arrest; and the record does not reveal unjudicial conduct in dealing with the criminal record which was a prominent aspect of the Townsend proceedings.

In any event, it is unnecessary to determine whether the circumstances here bring the case within the principle of the Townsend case, since the sentence must be set aside because it was imposed on an invalid plea of guilty.

## ORDER

And now, September 25, 1963, the petition of Anthony Perpiglia for a writ of habeas corpus is granted. Issuance of the writ will be stayed for 60 days, within which time the Commonwealth of Pennsylvania may either seek review of this decision or determine to proceed against the petitioner by rearraignment on the bills of indictment so that he may plead guilty or not guilty, after which the indictments may be proceeded with in accordance with law.

---

14. Mr. Justice Jackson there said that the judge's conduct savored of "foul play or of carelessness". "[O]n this record we conclude that, while disadvantaged by lack of counsel, this prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue. Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand. * * *

"It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process.

"Nor do we mean that mere error in resolving a question of fact on a plea of guilty by an uncounseled defendant in a non-capital case would necessarily indicate a want of due process of law. Fair prosecutors and conscientious judges sometimes are misinformed or draw inferences from conflicting evidence with which we would not agree. But even an erroneous judgment, based on a scrupulous and diligent search for truth, may be due process of law.

"In this case, counsel might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records, a requirement of fair play which absence of counsel withheld from this prisoner." (334 U.S. pp. 740–741, 68 S.Ct. pp. 1252, 1255, 92 L.Ed. 1690).