UNITED STATES of America ex rel.
George Lee RIVERS

v.

David N. MYERS, Superintendent, State
Correctional Institution at Graterford.

Misc. No. 2857.

United States District Court
E. D. Pennsylvania.

March 26, 1965.

Harry Shapiro, Herman I. Pollock, Vincent J. Ziccardi and Julian B. P. Brereton, Philadelphia, Pa., for relator.

Joseph M. Smith, John F. Hassett, Asst. Dist. Attys., Philadelphia, Pa., for respondent.

VAN DUSEN, District Judge.

This Petition For A Writ of Habeas Corpus asks the court for relief from a

finding of murder in the first degree and a sentence of death imposed by a three-judge Pennsylvania court in June 1957, after a plea of guilty to murder generally (p. 1a of R–5), and reimposed by such a court in October 1959. The background of this case is set forth in the previous opinion of this court (and in the previous state court decisions referred to in that opinion), denying a former Petition For Writ of Habeas Corpus filed by the same relator. See United States ex rel. Rivers v. Myers, 198 F.Supp. 511 (E.D.Pa.1961), aff'd 301 F.2d 782 (3rd Cir. 1962), cert. den. 371 U.S. 841, 83 S.Ct. 71, 9 L.Ed.2d 77 (1962).

After the above proceedings in the Federal Courts, relator sought a writ of habeas corpus in the Pennsylvania Courts in March 1963. This application was denied by Opinion dated April 19, 1963, of the Common Pleas Court No. 3 of Philadelphia County (March Term 1963, No. 1827),[1] aff'd 414 Pa. 439, 200 A.2d 303 (May 1964); cert. den. 379 U.S. 866, 85 S.Ct. 135, 13 L.Ed.2d 69 (Oct. 1964).

Hearings were held before the undersigned on November 10, 1964, December 14–15, 1964, and January 8, 1965. Very helpful and able briefs were filed by counsel in February 1965 (see Documents 15–17).

On March 26, 1957, Jacob Viner was fatally shot in his North Philadelphia pharmacy during the course of a robbery and in the presence of his wife. The following afternoon, the police arrested three persons, Williams, age 20; Cater, age 19; and the relator, Rivers, age 18, who was born on March 9, 1939.

Rivers was arrested about 5 P.M. on March 27, 1957, and taken to Room 117 City Hall, which was then the Homicide Division Headquarters. He was questioned by the police until after midnight, at which time he was taken, without a hearing, to a cell block. During this period, Mr. Rivers signed a written statement (R–7) confessing his part in the crime. The actual dictating of the statement, according to the police, took over three hours and started at 9:30 P.M. When giving this statement and the statement taken the next day, there is no evidence that relator was advised of his constitutional right to remain silent and not to answer any questions.[2]

The following morning, March 28, 1957, the relator was given a preliminary hearing, but instead of being sent to the County Prison, he was returned to the Homicide Headquarters. The preliminary hearing ended with Mr. Rivers being held for a further hearing on April 4, 1957, at the request of the Commonwealth.

During the questioning, which took place on March 28, 1957, the relator signed another written statement (R–8), the dictation of which began at 2:10 P.M. and ended at 4:55 P.M. The reason given by the police for the second statement was that they were not satisfied with the allegations in the first one concerning the division of the money on the street, rather than in a house, which might result in the criminal liability of persons in addition to Williams, Cater and Rivers (p. 88a of R–5 and testimony of Sergeant Mercer in this proceeding).

The testimony of the police indicated that Mr. Rivers was permitted to make a phone call, but chose not to do so. The police did, however, call his mother, who was permitted to see him on March 28, 1957 (p. 80a of R–5).

1. A copy of this opinion is attached to the Answer (Document 6).

2. Both of relator's statements (R–7 and R–8) contain substantially this language (see 91a and 142a of R–5):

"Q. Do you know why you have been arrested?

"A. Yes, I do, for robbery and murder.

"Q. I want to warn you that anything you say in this statement will be used for or against you at the time of your trial in court. Understanding this do you wish to make a voluntary statement telling us the truth as you know it?

"A. Yes, I do.

"Q. Has any person made any promises, force or fear or threats to get you to make this statement?

"A. No, they haven't." (p. 91a of R–5).

Mr. Rivers entered a plea of guilty before a court of three judges, as did the other defendants, on June 17, 1957. The court appointed experienced counsel for each defendant and Mr. Rivers was represented by Garfield Levy, Esq., a lawyer of 27 years' experience who had tried over 400 homicide cases, and by Irwin Apfel, an attorney of 37 years' experience. After the plea was entered, various other evidence was presented, including the two statements of Rivers. Mrs. Viner testified that she could only identify Williams and not the other two defendants. A psychiatric report of Dr. Mallin was also introduced, in which it was stated that Rivers was emotionally dull and that his intelligence and reasoning were impaired. The diagnosis stated that Rivers was a mental defective with a psychosis, moderately severe and chronic. In conclusion, Dr. Mallin's report held that he was psychotic and probably a low-grade moron, in addition to being very suggestible and easily led by others.

Police Officer Mercer, who had questioned Rivers on March 27, also testified that he (Rivers) had difficulty reading and had difficulty with words of more than one syllable. (At subsequent hearings, Dr. Mallin's report was supported by the psychiatric reports of Drs. Torney, Silas Warner and Jonas Robitscher.[3] See Appendix A, p. 48. It was also brought out at a later hearing that the highest, regular grade achieved by Rivers in school was 2B and he had attended special schools for sub-normal students for several years. See Appendix A, page 47.

The court, on June 17, 1957, adjudged the three defendants guilty of first degree murder and imposed the death penalty. The Pennsylvania Supreme Court, however, on reviewing the proceeding, vacated the sentence (of Cater and Rivers) and remanded it back to trial court for re-sentence as certain evidence had been misapplied. See Commonwealth v. Cater, 396 Pa. 172, 152 A. 2d 259 (1958).

Another hearing was held on September 18, 1959, after which the finding of first degree murder was affirmed and the death penalty was again imposed.

Based on the above factual situation, paragraph 23 of the Petition reads as follows:

"23. It is further averred that the confessions which were extracted from this uneducated, 18 year old mentally defective and mentally ill boy, were involuntary because:

"a) he was denied counsel to assist him during the stages of the police investigation of the murder for which he was one of the principal suspects;

"b) he was held incommunicado by the police for more than 24 hours during which time two confessions were extracted from him, and

"c) he was not informed of his constitutional right to remain silent during the police interrogations nor advised of his right to contact an attorney."

This record[4] requires the conclusion that, in taking these statements on March 27 (R-7) and March 28 (R-8)

---

3. The testimony of Dr. Robitscher (N. T. 251 ff.), who did not examine Rivers until 1961 but who, as a consulting psychiatrist, treated him once a month for 18 months between 1961 and 1963, supported the views of the doctors whose reports are quoted and summarized in Appendix A.

4. For various reasons, including the fact that the opinion in Escobedo v. State of Illinois, supra, was filed in late June 1964, over a month after the last decision of any Pennsylvania court in this

matter, the undersigned suggested to counsel that this Petition For A Writ of Habeas Corpus, as supplemented (see Document 5) be returned by agreement for reconsideration by the Court of Common Pleas of Philadelphia County. The District Attorney would not agree to this procedure, but by the attached letter of November 27, 1964, agreed that this court should "hear testimony on any other point which relator cares to present apart from the issues before Judge Chudoff" and that respondent would "not raise

and receiving them in evidence at the judicial proceedings in June 1957 and September 1959, relator was denied the assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments under the decision of the Supreme Court of the United States in Escobedo v. State of Illinois, 378 U.S. 478, 490–491, 84 S. Ct. 1758, 12 L.Ed.2d 977 (opinion of 6/22/64). In that case, the court used this language at pp. 490–491, 84 S.Ct. at p. 1765:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342 [83 S.Ct. 792, at 795, 9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

Under the reasoning of the Escobedo case, supra, the activities of the police officers had become accusatory[5] (since they had "begun to focus on * * * (3) particular suspect(s) * * *,") rather than investigatory, by 9:30 P.M. on March 27, when the first formal statement of relator was taken, in view of these events:

A. In the early afternoon of March 27, Mrs. Ethel Robinson called the police to notify them that one (Cater) of the three boys believed to have participated in the robbery-homicide was in her luncheonette (pp. 11a and 14a of R–5). Cater was arrested by Officer Thomas at about 2 P.M. on that day (p. 39a of R–5).

B. Relator was arrested at between 5:00 and 5:30 P. M. on March 27 at his home (R–12). He arrived at the homicide unit on the first floor of City Hall at 6 P.M. on that date (R–12). From 6:10 P.M. until 9:30 P.M. on March 27, he was interrogated by Sergeant Mercer and Detective Shanahan (R–12). Rivers was the last of the three co-defendants arrested.

C. Cater made a formal statement to representatives of the Philadelphia Police Department on March 27 at 8:50 P.M., describing Williams and relator as the primary instigators in the robbery-homicide in which they had all participated.

It is interesting to note that relator's able counsel, who served him well until April 1963, when he was called to testify, anticipated the holding in the Escobedo case, supra, by arguing in the state courts in June 1957 that relator's second statement had been secured in violation of his constitutional rights (pp. 113a–114a of R–5). Even if the undersigned is incorrect in believing that both statements will be inadmissible in the additional judicial proceeding which will be necessary to determine the degree of murder and the sentence, the second statement may not be so used under the facts of this case as related above.

This additional proceeding is necessary because both statements (or at least the second statement) were the basis of the finding of first degree murder and the sentence of death imposed in June 1957 and again in the fall of 1959.

█ The opinion of February 2, 1960, makes clear that the state court "examined" and "evaluated" the confessions of relator (p. 243b of R–6), so that the

---

the exhaustion argument (relator's failure to exhaust his state remedies)." See

letter of 11/27/64 attached to this opinion.

**5.** See 378 U.S. 490–492, 84 S.Ct. 1758.

process of securing them was a "critical stage" of the proceedings for relator. See United States ex rel. Dickerson v. Rundle, D.C., 238 F.Supp. 218, p. 220 (1965). In fact, the description in the opinion dated February 2, 1960, of relator's part in the crime is apparently based on these statements. See this language at pp. 243b–244b of R–6:

"The statements of Rivers alone leave us in no doubt that Rivers met Cater during the morning preceding the killing; that Rivers needed money and *had in mind to perpetrate a hold-up;* that Rivers saw Cater take the gun from the dresser drawer, and that when they reached the drugstore Rivers stated that here was some quick money. Rivers also shared in the quick money. It was he who agreed to be the lookout man and who opened the door of the drugstore because his fingerprints were not on record." (Emphasis supplied.)

It is noted that the italicized language from the court's opinion is based on these words, which appear only in the second statement given by relator at 2:10 P.M. on March 28, more than 20 hours after he had been taken into custody and almost four hours after he had been given a hearing before a magistrate (9:30 A. M. on March 28): [6]

"I had it in my mind then to pull a holdup." (p. 2 of R–8)

There was no mention of any previous thoughts of a "holdup" in the statement given on the night of March 27 (R–7).

The additional information referred to in Appendix C, which was not available in the fall of 1962, makes it quite possible that a sentence of death would not be imposed at this time.

 The fact that relator did not request counsel does not make the principle of Escobedo inapplicable, for as the California court said in People v. Dorado, Cal., 40 Cal.Rptr. 264, 394 P.2d 952

(1964), "The defendant who does not realize his rights under the law and who therefore does not request counsel is the very defendant who most needs counsel." On the facts in this record, particularly the mental deficiency of relator, a demand for counsel by a defendant of the age and mental capacity of relator is not essential to require the application of the principle of Escobedo v. State of Illinois, supra.

 Respondent's contention that the inclusion of an argument based on the Escobedo case, supra, at page 18 of relator's Petition For A Writ of Certiorari and the subsequent denial of that petition by the Supreme Court of the United States precludes the consideration of that argument in this proceeding must be rejected. See Brown v. Allen, 344 U.S. 443, 488–497, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947).

 Relator also contends that his constitutional rights were denied (a) by entry of his guilty plea at a time when he was incompetent, unable to understand "the peril of his position" and unable to assist counsel in his defense, and (b) by being subjected to a judicial proceeding to determine the degree of homicide and his sentence at a time when he was unable to communicate effectively with counsel and understand the nature of the proceedings (see par. 22 of the Petition, being Document 1).

1. Competency of relator at the time of entry of his plea and voluntary nature of that plea (II and III on pp. 7–17 of Brief in Support of Petition for Writ of Habeas Corpus, being Document 15).

Dr. Mallin examined relator on June 5, 1957, at the request of his counsel, knowing that he had been charged with homicide during a holdup. Relator conceded that the three participants "decided to hold up Viner's drug store. * * * He entered the store with the others and remained at the door watching the outside." (p. 170a of R–5). In

---

**6.** Relator was not taken to the County Prison until 7:09 P. M. on the night of March 28, over 25 hours after his arrest.

addition to the excerpts from Dr. Mallin's report quoted in Appendix A, the following, among other material, appears at 171a–172a:

"Neurological examination is entirely normal. From the psychiatric standpoint, he is emotionally dull, blunted, and very slow in his speech. Speech is coherent and relevant, but with diminished spontaneity. * * *

* * * * * *

"He was fully aware of what he was doing in the holdup, and was aware that Williams was carrying a gun. He knew right from wrong, knew the nature and quality of the act, and his reasoning capacity was impaired by the use of alcohol and marijuana. There would be danger in the future of repetition of the act under the leadership and suggestion of others. The nature of his mental deficiency and mental illness should be considered in his sentence. Treatment of the psychosis is indicated, but the mental deficiency cannot be corrected."

It is clear that relator did not have impaired reasoning from use of alcohol and marijuana after two months in jail. In view of Dr. Mallin's experience with criminal cases, this report is a statement of his opinion that relator was sane at the time of committing the offense and was competent to confer with his counsel and stand trial in June 1957, but that the nature of his mental illness and mental deficiency should be considered in determining his sentence. It is significant that Garfield Levy, Esq. testified that he was "concerned enough" about the relator's being able to understand the consequences of a plea or of a trial "to ask Dr. Mallin to examine the defendant and give us his evaluation as to whether he

was competent to stand trial * * * the results of that evaluation are part of the record" (p. 35 of R–1). Mr. Levy also stated that he thought relator was "competent to understand the nature of his plea," (p. 37 of R–1), thereby indicating that he believed Dr. Mallin's report covered such a finding.

Relator's able counsel had the following information concerning him at the time of his arraignment in June 1957:

A. The report of Dr. Mallin dated 6/7/57 (pp. 169a–172a of R–5), indicating that the nature of his mental deficiency and mental illness should be considered in his sentence but not that he was incompetent to confer with his counsel or to understand the nature of a guilty plea.

B. The Municipal Court records, showing relator's diagnoses as a moron in 1953, 1954 and 1955 (N.T. 44 of R–1).

C. The school records of the relator (see Appendix A).

D. Information secured from his visits with the relator.

At the habeas corpus hearing before Judge Chudoff on April 18, 1963, both Mr. Levy and Mr. Apfel testified that because there was great difficulty in communicating with Mr. Rivers, they "went back and back" over the same subject until Mr. Rivers, in their opinion, understood the nature of what they were saying and the nature of his act (p. 35, Exhibit R–1). To quote Mr. Levy, "I think we exerted every effort to make him understand and I think that we were satisfied that he did understand" (p. 36, Exhibit R–1).[7] Mr. Apfel also stated that he had formed the opinion that Rivers was competent to enter a guilty plea and that the significance of the plea was explained to him (p. 93, Exhibit R–1).

7. Also, Mr. Levy testified:
"* * * If I thought he were not competent to understand the nature of his plea, I would not have allowed him to plead * * *." (p. 37 of R–1)
Again, at N. T. 52 of R–1, he testified:
"Q. Now my question now is prior to the trial was it your conclusion,

based upon these things that you had, that the defendant was competent to enter a plea of guilty?
"A. Absolutely."
Mr. Levy entered his appearance for relator on April 17, 1957 (N. T. 28 of R–1).

W. Bradley Ward, Esq.,[8] who represented Cater, also testified that in their joint meeting (between all defendants and all attorneys) that "we exhaustively explained to those boys their precise legal position" and that the significance of the plea was "completely" explained to relator. He could not recall a case where more care was taken in explaining a position to a client (p. 99, Exhibit R–1). At pp. 102 and 103 of R–1, Mr. Ward testified:

"My conclusion is it never crossed my mind there was any [mis]apprehension on the part of any of these three men of the import and the advice and the explanations which we gave them." (p. 102)

\* \* \* \* \* \*

" \* \* \* he grasped and understood what it was all about." · (p. 103).

At the time of arraignment, relator testified that no one [9] had promised him anything before entering his plea. Also, the transcript contains this question by his able counsel and this answer (pp. 6a–7a of R–5):

"MR. LEVY: You understand that in entering this plea of guilty you could be found guilty of murder in the first degree and sentenced either to life imprisonment or the electric chair? Do you understand that, Mr. Rivers?

"DEFENDANT RIVERS: Yes, I do."

The three-judge court presiding over the judicial proceeding of June 1957 stated (p. 205a of R–5):

"These defendants are sane and fully understood the nature, significance and consequences of their acts."

Relator relies principally on the testimony of Dr. Robitscher (N.T. 251ff.) to support his contention that Rivers was on June 17, 1957, incompetent to understand the significance of his plea or the proceedings against him or properly to assist counsel in his defense.[10] See United States ex rel. Perpiglia v. Rundle, 221 F.Supp. 1003, 1006 (E.D.Pa.1963). Cf. Kercheval v. United States, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

As stated above at page 41 (footnote 3), Dr. Robitscher treated relator approximately once a month for a period of 18 months in 1961–1963. From what relator said to him, his observation of relator, the doctors' reports that he had read, the time he understood relator's counsel had spent with him prior to arraignment, and the knowledge of relator acquired by such counsel, and other materials referred to in Appendix A, Dr. Robitscher concluded that relator was not able "to understand the nature of the charges against him, the significance and effect of his guilty plea or properly assist his attorney in preparing the case" (N.T. 253–4, 263, 269). The undersigned is unable to accept this testimony of Dr. Robitscher, after considering the record as a whole, for these reasons, among others:

A. Dr. Robitscher's testimony makes clear that he accepted the statements of relator during the period 1961–1963, such as that relator did not understand that he might receive the death penalty if he entered a plea of guilty,[11] whereas the undersigned does not accept such testimony and finds that almost all of his testimony was motivated and directed to the vacating

---

8. Mr. Ward in 1963 was a lawyer of 31 years' experience and had tried 46 homicide cases (N. T. 94 and 101 of R–1).

9. He was specifically asked whether the District Attorney or the police had promised him anything before entering his plea (p. 6a of R–5).

10. See pp. 7–17 of relator's brief (Document 15).

11. On cross-examination, Dr. Robitscher conceded that it was impossible to reconstruct what relator thought at the time of entering his plea (N.T. 276). Also, he apparently chose to ignore the statement made by relator at the time of the arraignment that he understood he might go to the electric chair as a result of his plea (pp. 6a–7a of R–5).

of his sentence and securing his release from confinement, and that very little of his testimony in this proceeding was accurate. See Appendix B.

B. Dr. Robitscher was under a misapprehension concerning the time that relator's counsel had conferred with him prior to the entry of his guilty plea.

At N.T. 264, Dr. Robitscher testified that there was only one conference between relator and his counsel before the conference when he decided to plead guilty, but there is no evidence in this record that there were only two conferences in which Mr. Levy participated. In fact, the record shows there was one conference prior to April 17 (p. 88 of R–1) and the conference within 30 days of June 17, at which all counsel, including Mr. Ward, were present, as well as the conference when relator agreed to enter a guilty plea. Mr. Levy testified that we went "back and back over the same subject." See p. 35 of R–1.

C. Dr. Robitscher incorrectly thought that Mr. Levy did not know of relator's mental deficiency (see pp. 11 and 13 of Document 17). Mr. Levy knew that relator was a low-grade moron and referred to this and to Dr. Mallin's report in June 1957 (pp. 116a and 169a–172a of R–5). A fair reading of Mr. Levy's argument at the second sentencing hearing in September 1959 (pp. 172b–173b of R–6) is that he had not emphasized the mental deficiency sufficiently at the first hearing and that he now had more confirmation of relator's limited intelligence.

D. Dr. Robitscher conceded that a non-medically trained person, who had previous experience with people of low mentality and was aware of the great lack in educational background and reasoning of relator, could make him understand the consequences of his guilty plea (p. 58).

2. The major considerations in the decision to enter the guilty plea did not include the existence of the two statements.

█ The able counsel for relator advised him prior to the entry of his plea in June 1957 that if his case was tried to a jury, the tenor of public opinion was such that "there was a very good likelihood that [he] * * * would go to the electric chair." Mr. Levy testified as follows at N.T. 33–34 of R–1:

"I know that we explained to him in great detail the results of a plea of guilty. It was, to the best of my recollection, the considered opinion between all of the counsel at the time that if this case went to a jury with the tenor of the public as it was at that moment and the kind of homicide, that this was, there was a very good likelihood that the defendants would go to the electric chair.

\* \* \* \* \* \*

"Now, we thought that perhaps in mitigation, a plea of guilty, and I remember to this extent saying to the defendant—and I can't say that he comprehended it—that the Board of Pardons has never reversed a jury verdict of a death penalty, but that with a plea of guilty before three judges there was a better chance for him to avoid the death penalty, and this was our considered opinion. That it turned out to be wrong, I am exceedingly sorry for that and I have tried to atone for the last six years rather relentlessly. But this was the import of the conversation.

\* \* \* \* \* \*

"Mr. Rivers said that he was guilty, that he had signed a statement that he was, that he was sorry for what he had done, and that he thought—that he agreed or thought I can't tell you—that a plea of guilty should be entered."

Also, relator and his counsel knew that there was the following ample evidence (among other evidence) to permit a

jury to find that relator was guilty of murder in the first degree:

A. Mary Mason testified she saw the three defendants together in a luncheonette near the Viner store at 5:45 on March 26 (9a–10a of R–5).

B. Mrs. Bella Viner, widow of Jacob Viner, testified that she saw Williams on the evening of March 26 about 6 P.M. in her husband's store (16a of R–5). She could "look straight through" to the store from the kitchen (17a). She saw Williams shoot her husband in the laboratory and go through all his pockets (18a). She heard one of the other boys.

C. Jacob Brager saw three young men run out of Viner's drug store at 6 P.M. on March 26 after he heard Mrs. Viner hollering "They killed my husband" (28a of R–5).

D. James Jackson testified that the three defendants, who were out of breath, came into the Pringle house at 2549 Marston Street (near the Viner store) shortly after 6 P.M. on March 26 and asked that a cab be called for them (35a–37a of R–5).

E. Clarence G. Burrell, cab driver, testified that he picked up the three defendants at 2549 Marston Street at 6:20 on March 26 in response to a phone call. Cater sat in the front seat next to the driver and when they passed the Viner drug store, he raised his body so that his head would be above the door line and near the roof (30a–34a of R–5).[12]

Under these circumstances, relator has not sustained his burden of showing that his guilty plea was involuntary or coerced. See Hudgins v. United States, 340 F.2d 391, 395–397 (3rd Cir. 1965); cf. United States ex rel. McCode v. Myers, D.C., 240 F.Supp. 384.

The findings of the undersigned on certain other matters argued by relator are contained in Appendix B.

The Petition, as supplemented, will be granted. If any party files an appeal promptly, an appropriate supersedeas order may be submitted to the undersigned.

## APPENDIX A

The School Records of relator included the following (pp. 157b–160b of R–6):

"George Lee Rivers was admitted to the Philadelphia school system September 21, 1944, in kindergarten. He was not mature. He dropped out and was readmitted 6–1–45. He proceeded regularly at the Blaine, the McIntyre, and then was assigned to orthogenic backward on February 2, 1948, at the McIntyre School. He stayed there in O.B. until February, 1952, when he went to the Kane School. He continued in O.B. Then on September 26, 1955, he was assigned to the Boone Disciplinary School. His cooperation began at the outset in 1–A grade as unsatisfactory and continued that way. It was unsatisfactory through '54, '55, '56 through deterioration. He was flagrantly absent from school. The total unexcused absences, 32 days in the first term of June, '54; 23 the first term of '55; 38 and 30 the first term of '56. Perhaps this would be helpful. George scored an I.Q. of 69 on individual psychological examination administered December 16, 1947. He had been a behavior problem through most of the elementary grades. His attendance had been extremely irregular from the outset of George's school career. He repeated the 1–A grade and was placed in the orthogenic backward class on 2–2–48 following assignment to a 2–B grade. He remained in this until he went to Boone.

---

12. Relator's counsel knew that his client's statements, admitting his participation in the crime which relator made to his doctor (Dr. Mallin) would also probably be considered at any trial involving the choice between the death penalty and life imprisonment if his client was to have the benefit of Dr. Mallin's testimony. In any subsequent sentencing, it would appear that Mr. Levy's testimony of relator's statements of guilt to him would also be admissible (87a–90a of R–1) since relator, in the presence of his present counsel, agreed that Mr. Levy might testify to his conversations with relator (pp. 16–20 of R–1).

\* \* \* \* \* \*

"Q. Would you tell me the highest grade he achieved in school?

"A. The highest grade he achieved in school was 2–B, and from that point on he was transferred to the orthogenic backward, which is, as you know, ungraded, and from there he continued until '55, when he was placed at Boone Disciplinary School.

"BY JUDGE SPORKIN:

"Q. What is 2–B?

"A. 2–B would mean the second term of the second grade which he achieved 9–5–47, and from that point on he was placed in an ungraded class of a group of slow learners.

"BY MR. LEVY:

"Q. Do I understand, sir, he never achieved anything higher than the 2–B grade and he left school at the age of seventeen?

"A. In an ungraded class the achievement goes higher than that, but they are never graded in terms of the usual achievement, grade by grade.

\* \* \* \* \* \*

"He left the school system in Boone on March 9, 1956, when he was dropped because he was over the compulsory school age."

At the time of relator's referral to the Boone School in September 1955, he had scored an I.Q. of 75 (p. 225b and 229B of R–6).

The report of Dr. Aaron W. Mallin, as a result of an examination of relator made on June 5, 1957, including the following (pp. 171a–172a of R–5):

"Delusions and hallucinations are present. \* \* \* Orientation is good, but memory is defective; he cannot give the date of the homicide, and cannot give other details of his life. Intelligence and reasoning are impaired; he performs only the first step in subtracting 7 from 100 very slowly; current knowledge is poor.

He has not cried since his arrest. Judgment and insight are impaired.

"Diagnosis: Mental Deficiency with Psychosis, modtrately\* severe, chronic.

"Conclusions and Recommendations: This man is psychotic and moderately mentally defective, probably a low-grade moron. He is very suggestible and easily led by others."

On September 28, 1959, Dr. Torney examined the relator (pp. 147b–157b of R–6) and his report included the following (p. 150b):

"He is presently functioning in the borderline mentally defective range of intelligence having achieved a Wechsler-Bellevue I.Q. of 77, verbal I.Q. 67; performance I.Q. 91. His mental abilities are very unevenly developed. His reflective abilities are at the defective level. This test pattern points up a highly impulsive individual whose behavior is governed chiefly by immediate need and desire to the exclusion of rational consideration."

Dr. Torney also testified that he was a "borderline mental defective" and "a middle grade moron" and that his "thinking and reasoning" capacities were "definitely impaired" (p. 153b). Also he testified that relator, being a mental defective, was "more easily led than a person of normal intelligence" (p. 154b). Relator's I.Q. in 1953 had been 69 and it could have been lower than 77 in 1957 (p. 156b–157b).

In October 1959, Dr. Warner classified relator as a "border-line mental defective" with a "passive" rather than "aggressive" personality, and described his "thinking" ability as follows (pp. 164b–165b of R–6):

"A. Well, it's a very limited capacity to think. The ability to think abstractly, for example, is affected and extremely limited. He is not able to use the same kind of judgment in an act as the average per-

\* Apparently should be "moderately."

son would. He is limited in his ability to foresee consequences of acts. He is limited in considering all the factors that go into certain acts. He is not capable of bringing together all the necessary knowledge to make a proper decision. In all these ways he is limited by his intellect.

"Q. Is he easily leadable?

"A. Usually a person of this I.Q. is highly suggestible and easily leadable."

## APPENDIX B

*Alleged Physical Coercion of Relator*

Although the application of the Escobedo case, supra, makes unnecessary any further consideration of the confessions, the hearing judge is including these comments in view of relator's allegations against the police officers and the bearing of such unproved allegations on his credibility.

The charge of physical beatings was not a part of the original Petition (Document 1) filed with this court, but it was asserted by the relator during the habeas corpus hearing on December 14, 1964.[a] It is the finding of this court that the alleged beating did not occur, but was, in fact, a complete afterthought which may have been suggested to Mr. Rivers by fellow inmates (i. e., Anthony Scoleri and Richard Mayberry).[b] The relator was convicted and sentenced on June 24, 1957, yet the first time that the undersigned can find any public reference to or mention of the alleged beatings is during the State Court hearing of April 18, 1963.[c]

At the December 14, 1964, hearing before this court, Mr. Rivers testified that he told his attorney, Garfield Levy, of the beating, as well as telling fellow inmates (James Cater, John Hughes, and "a fellow by the name of Mannings") and members of his family (see Document 9, transcript of proceedings, pp. 14–21). It is significant that no members of Mr. Rivers' family referred to the beating, although they were in court and were called upon to testify. It is also difficult to believe that Mr. Levy, who has since died, knew of the alleged beating, as he was in court and did testify at the April 18, 1963, hearing before Judge Chudoff (the same hearing at which Mr. Rivers first brought up the matter of the beating), but the record reveals no testimony of Mr. Levy regarding any knowledge on his part of Mr. Rivers being beaten by the police. Nor can it be inferred that Mr. Levy's files contain any notation of a beating in that such files were not produced, even though Donald Goldberg, Esq., Mr. Levy's former associate, was in court during the November 10, 1964, hearing and was most cooperative.[d]

It was also the relator's testimony before this court (see N.T. 207–8, Document 9) that his co-defendant, Mr. Cater, witnessed him coming up from the al-

a. See N. T. 192 ff (Document 9).

b. Relator testified as follows at N. T. 202–3 (Document 9):
"Q Who prepared the petition that you filed for a—what is called a writ of habeas corpus in the Philadelphia Courts?
"A Anthony Scoleri and—
"Q How come—
"THE COURT: Wait a moment. 'And?'
"THE WITNESS: And Richard Mayberry.
"Q And Richard Mayberry?
"A Mayberry.
"Q It figures. How did you come to be talking to Mayberry and Scoleri about petitions and such?

"A Well, I told them different stuff that had happened to me, and I had had

—I got this stuff from my—from Garfield Levy—not Garfield Levy—what is his name? I can't remember his name.
"THE COURT: Mr. Goldberg?
"THE WITNESS: Yes, Mr. Goldberg, Mr. Donald Goldberg. I got my minutes, and—because they asked me to get them.
"BY MR. SMITH:
"Q who asked you to get them?
"A Scoleri, and Richard Mayberry.
"Q And Mr. Mayberry. When did you first meet Mayberry and Scoleri?
"A 1961."

c. See Exhibit R–1 at pp. 67 ff.

d. Mr. Levy's original notes of his discussions with Mr. Rivers are attached to Exhibit R–1, yet they reveal no mention of a beating.

leged beating in the following condition: "Everything I had on was nothing but that smut that you would get up off the floor, and he saw me crying, and everything else." (See N.T. 208, Document 9). However, Mr. Cater did not testify, nor can this court find any past recorded statements of Cater, regarding the beating.

The testimony regarding the "downstairs" from the homicide headquarters indicated that the only room meeting such a description was the lavatory, which was described as being quite clean and not covered with "smut." [e]

In addition, the sworn testimony of the policemen who were involved in the Rivers investigation not only denied any knowledge of the alleged beating but also was to the effect that the relator was never observed in any condition resembling that of a beaten man (N.T. 332–433, particularly 375, 388, 392, 400–401, 406, 409–410, 419, 422, 431). This included the testimony of former Detective Shanahan, whom Mr. Rivers identified as one of the policemen who administered the beating (N.T. 332ff., 364).

## APPENDIX C

The record and the Pennsylvania appellate court decisions indicate that a reconsideration of the information now available concerning relator's sentence is required not only to eliminate consideration of the contents of his statements taken on March 27 and 28, 1957, but also to assure that additional evidence is not overlooked, since "In such a solemn and drastic proceeding there is no room for a scintilla of error." See Commonwealth v. Cater et al., 396 Pa. 172, 182, 152 A.2d 259, 265 (1959). [f]

The following evidence bearing on the sentence of relator is available at this time, which was not available before the court in the fall of 1962:

I. The testimony of various members of the family concerning the lack of parental help or training and other handicaps undergone by relator during his youth which limited his judgment, reasoning and understanding (N.T. 160–185 of Document 11).

II. The testimony of Dr. Robitscher (N.T. 252–286 of Document 9), who treated relator for a period of more than a year, indicates that he would report that relator was not in a position to foresee and anticipate the consequences of his acts to the extent that the other two defendants were (or that an average boy his age would be) for reasons such as these, among others:

A. He was mentally defective (see Appendix A).

B. His judgment and insight were impaired (Dr. Mallin, pp. 171a–172a of R–5), due to absence of family help, as referred to under I above, as well as other factors.

C. He had been drinking and had one marijuana cigarette before the holdup (p. 170a of R–5).

D. He had a psychosis (p. 172a of R–5).

e. See N. T. 369–374, D–2, 379–380, D–3, 382, 402–3 and 414.

f. In Commonwealth v. Cater, 402 Pa. 48, 55–56, 166 A.2d 44, 48 (1960), the Supreme Court of Pennsylvania repeated this language, which had been used by it in an earlier case:

"* * * 'an appropriate exercise of judicial discretion as required by the statute contemplates that the death penalty be imposed where all the facts surrounding the criminal act and the criminal actor have been exhaustively considered and where, after such consideration, no other conclusion can be justified than the extermination of the convicted criminal by death.'"