(No. 33165.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM HEIRENS, Plaintiff in Error.

*Opinion filed Sept. 23, 1954—Rehearing denied November 15, 1954.*

HERBERT M. WETZEL, of Chicago, (ARTHUR FRANKEL, WALTER S. KUREK, and EDWARD STASUKAITIS, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, JOHN GUTKNECHT, State's Attorney, of Chicago, JOHN L. DAVIDSON, JR., WILLIAM C. WINES, and FRED G. LEACH, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and ELMER C. KISSANE, all of Chicago, of counsel,) for the People.

CALVIN SAWYIER and ARTHUR R. SEDER, JR., both of Chicago, *amici curiae.*

Mr. Justice Klingbiel, delivered the opinion of the court:

On September 4, 1946, William Heirens pleaded guilty, in the criminal court of Cook County, to three murder indictments and twenty-six additional indictments charging various burglaries, robberies and assaults. After pronouncing judgments of guilty the court sentenced Heirens to the penitentiary for life on each of the murder indictments, the sentences to run consecutively, and imposed the statutory sentences on the other indictments, the latter to run concurrently with each other but consecutively to the sentences on the murder indictments. On July 8, 1952, Heirens filed a petition under the Post-Conviction Hearing Act, (Ill. Rev. Stat. 1953, chap. 38, par. 826 *et seq.*,) setting forth a number of respects in which he alleged his constitutional rights had been violated. The State filed an answer and a hearing was had, after which judgment was entered denying the petition. Hierens seeks review by this court on writ of error. We have appointed as *amici curiae* Calvin Sawyier and Arthur R. Seder, Jr., who have filed briefs on behalf of petitioner.

It is contended that police unlawfully searched petitioner's living quarters and seized property found there; that he was subjected to unduly prolonged and continuous questioning by law enforcement authorities; that he was injected with sodium pentothal at their direction and against his consent, to obtain admissions and confessions from him; that he was compelled to submit to a lie-detector test; that adverse newspaper publicity would have prevented him from receiving a fair and impartial trial; that he was subjected to insistent urgings of counsel and parents to plead guilty; that his attorneys, instead of giving him their undivided allegiance, mistakenly conceived it their duty to avoid any action which might result in his return to society; and that the pleas of guilty were not the result of his free and voluntary choice but were induced or compelled by the

illegally obtained evidence, his disclosures while under the influence of drugs, the improbability of a fair trial in view of the newspaper publicity, and the pressure exerted by parents and counsel.

The major portions of the briefs in this court, however, are devoted to argument on questions which were not before the criminal court in the post-conviction hearing. Thus petitioner's counsel of record contend that failure to appoint a guardian *ad litem* for petitioner, who was a minor when the judgments were entered against him, deprived him of a constitutional right; and the *amici curiae* contend that failure to hold a hearing on the matter of petitioner's sanity at the time of the commission of the crimes of itself deprived him of a constitutional right. Neither of such issues was presented to or decided by the trial court in these proceedings, and while the respondent here has seen fit to argue them on the merits we nevertheless cannot undertake to pass upon them. The function of this court in cases of this kind is to review the decision and rulings of the lower court. Where the contention that constitutional rights were denied is based on grounds not raised or passed upon in that court we will not consider them. See *People* v. *Niemoth,* 409 Ill. 111, 119; *People* v. *Dale,* 406 Ill. 238, 243; *People* v. *Holt,* 398 Ill. 606, 614-615; Ill. Rev. Stat. 1953, chap. 38, par. 828.

A determination of the questions properly before this court requires consideration of the evidence in some detail. The record discloses that on June 26, 1946, the petitioner, a seventeen-year-old University of Chicago student, was captured by Chicago police officers while prowling in an apartment house on the north side of the city. In the course of a struggle with the officers one of them broke three flower pots over petitioner's head, inflicting severe injuries. He was taken unconscious to a hospital, where he remained as a bed patient for five days. On the day of his arrest police searched his living quarters at the uni-

versity, and recovered a number of articles later identified as having been stolen. During the following two days petitioner was intermittently questioned in the hospital by police and an assistant State's Attorney, and was subjected to questioning all night of the second day. Petitioner failed to respond coherently, but stared with a vacant expression and behaved in an irrational manner throughout the interrogation.

On the third day the State's Attorney directed a specialist in psychiatry to administer sodium pentothal to petitioner, in order, it is said, to ascertain whether he was malingering. No permission was obtained from petitioner or his parents. Petitioner was injected with sodium pentothal, a so-called "truth serum," which produces a mental state of semi-consciousness wherein the individual is unable to critically survey his responses to questions, or to associate, select and inhibit his remarks. While petitioner was under the influence of this drug, he was questioned about his life and development, and his past and recent experiences. He was asked about specific crimes, particularly the murder of Suzanne Degnan on January 7, 1946. He readily spoke about burglaries, the Degnan murder and other crimes, for which he was subsequently convicted, but attributed them to someone named "George," a person of bad influence who forced Hierens to search out places for him to burglarize. According to Hierens's disclosures while under the influence of the sodium pentothal, "George" was responsible for everything, and Heirens had constantly been trying to prevent him from committing the acts. When Heirens was asked to describe the man he called "George," he described himself exactly. Throughout the examination the State's Attorney, the first assistant State's Attorney, the police commissioner, and a stenographer were present behind screens which had been placed about the bed. The stenographer took notes during the questioning. After petitioner regained an awareness of his surroundings he sat up

in bed and asked: "What did I say? What did I say?" to which the first assistant State's Attorney replied: "Why you said all the things that I think we have to know." The examining doctor testified in the present proceedings that "the major factor in the productions which developed under pentothal were not those of a malingerer but those of a mentally sick boy;" that he informed the State's Attorney that petitioner was a disassociated psychotic schizophrenic; and that such affliction is "a mental disease characterized by a splitting of personality, in which very frequently one aspect of the personality may not be aware of the other, and may not be in communication with the other."

After the sodium pentothal interview, questioning by police officers was resumed and continued all night. On June 30, the following day, petitioner was taken to the detective bureau where the police, without obtaining his consent, gave him a polygraph or lie-detector examination. Heirens did not answer the questions but merely repeated each one as it was asked. About 6:30 o'clock that evening, however, he summoned the police captain to the hospital, and said he was going to tell everything. The State's Attorney and his assistant were then called, and Heirens proceeded to give a statement in which he admitted knowledge of the Degnan murder and other crimes but ascribed them to a "George Merman," whom he described as a friend who was always doing the wrong thing and would never listen to him. At the conclusion of this statement he was asked to print out the text of a ransom note involved in the Degnan murder, and he did so, making four copies. On the next day he was told that a handwriting expert found it was his own handwriting on the ransom note, and that in addition the ransom note misspelled two words and Heirens misspelled the same words.

On July 1 Heirens was brought into court on a petition for *habeas corpus* filed on his behalf by attorneys engaged by his parents. Shortly thereafter he was form-

ally charged with a number of burglaries, and some weeks later the murder indictments were presented. One of his attorneys conferred with the prosecuting attorney, who disclosed information tending to connect petitioner with the three murders as well as the burglary charges, and subsequently reviewed with petitioner the evidence against him. Petitioner's attorney informed him and his parents that several of the burglary charges could probably be successfully prosecuted; that in view of the publicity the case had received it was doubtful that a jury could be obtained which had not read about it; that it was reasonably certain severe and consecutive sentences would be imposed if the cases were tried on not guilty pleas, with the result that the rest of his life would be spent in the penitentiary; and that even though the possibility of a death penalty for the murders was remote it would be foolish to take the chance. Petitioner had told his attorneys as well as his parents that he committed the murders.

The attorney had conferred with a psychiatrist about the symptoms of mental derangement which Heirens had related to him, and was advised by the psychiatrist that although they showed an abnormality they did not render Heirens unable to distinguish between right and wrong. Several conferences were had between Heirens and his attorney concerning his mental condition and a possible defense of insanity. The attorney concluded there was no available proof that Heirens did not know the difference between right and wrong.

Petitioner's parents and attorneys agreed that the best course to take was to discuss a plea of guilty with the prosecution. The attorney accordingly met with the prosecutors, and an arrangement was reached whereby petitioner would plead guilty to the offenses with which he was charged, make a complete confession of the murders, and submit to a psychiatric examination to determine whether he was of sufficient mental soundness to make a plea. In

return the prosecutors were to recommend concurrent sentences of life imprisonment. On July 26 a conference was held in the county jail between petitioner, his parents and his attorneys, at which he and his parents signed an instrument directing the attorneys to proceed on the agreed terms. In addition petitioner then signed a written confession prepared by one of his attorneys from notes made during conversations of the preceding week. In the confession Heirens described the urge he would experience, at irregular intervals over the course of many years, to break into and enter other people's dwellings, the sexual manifestations which would accompany the urge; the sexual satisfaction derived in committing a burglary, and the headache or dizziness which usually preceded or accompanied the acts. The confession then proceeded to relate in some detail the murders of Suzanne Degnan, Frances Brown, and Josephine Ross, all committed in the course of burglaries.

On July 30, for the purpose of obtaining his confessions, Heirens was brought to the State's Attorney's office, where a large number of police officials, newspaper reporters and photographers were present. When he was questioned about the crimes, however, Heirens stated he did not remember. His counsel then took him into an adjoining room where Heirens repeated that he did not remember and remarked that he was upset. His parents were called. His attorneys questioned him as to why he did not make the confession, advised him to accept the proposition of the State's Attorney, and talked to him about the newspaper publicity. He was later informed by his attorneys that he should tell them whether he wanted them to continue representing him; that they had expected him to make a confession in the State's Attorney's office on July 30, and did not like to be taken by surprise; and that it appeared likely he would get the electric chair. Petitioner observed that he had no desire to take the chance

of being electrocuted, and that he would make a statement. In the meantime the State's Attorney had reconsidered, and insisted that the sentences to be recommended for the murders would now be consecutive, instead of concurrent as theretofore proposed, or else the cases could be tried on not guilty pleas. When informed of this, petitioner observed that if there was nothing else to do he would accept the terms and make the confession.

On August 6, Heirens was taken to the State's Attorneys office for the second time where he gave lengthy statements concerning the three murders, and late that afternoon he was taken to the localities of the crimes, where he "re-enacted" them. He was thereafter examined by three qualified psychiatrists, pursuant to an order of court, and a comprehensive report was made finding that Heirens "is not suffering from any psychosis, nor is he mentally retarded; he has average intelligence. He has a deep sexual perversion and is emotionally insensitive and unstable.  *  *  *  He is unstable, and hysterically unpredictable, and most of his actions can be swayed from time to time by the suggestions coming from his environment."

On September 4 petitioner was arraigned and pleaded guilty to the indictments after being warned of the consequences. A hearing was then held as to aggravation and mitigation, at which the prosecution introduced into evidence petitioner's confessions of August 6, transcribed statements of the re-enactments of the murders, the psychiatrists' report, the testimony of some eighteen witnesses, and stipulations concerning a number of the burglaries with which petitioner was charged. Petitioner's counsel offered no evidence in mitigation. The court thereupon entered judgments of guilty on petitioner's pleas.

Prior to the pronouncement of sentence the prosecutor and the principal defense attorney addressed the court. The State's Attorney in his remarks acknowledged the "co-operative assistance" of defense counsel and observed:

"The small likelihood of a successful murder prosecution of William Heirens early prompted the State's Attorney's office to seek out and obtain the co-operative help of defense counsel and, through them, that of their client. * * * Without the aid of the defense we would to this day have no answer for the death of Josephine Ross. Without their aid, to this day a great and sincere public doubt might remain as to the guilt of William Heirens in the killing of Suzanne Degnan and Frances Brown." Petitioner's attorney then proceeded to state to the court the reasons which impelled him and his cocounsel to adopt the course they followed. He remarked in part: "I have no memory of any case, certainly not in my time at the bar, when counsel on both sides were so perplexed as to the mental status of an individual and the causes which motivated him to do certain acts. In those cases we both sought psychiatrists in the hope that they might aid us. I must confess that at this time there exists in my mind many doubts as to this defendant's mental capacity for crime; and I believe doubt must exist in our minds as to just what the relation of cause and effect was, and how he could, in a manner so devoid of feeling, do the acts here charged and upon which the plea has been guilty. On acquiring knowledge, your Honor, of the facts we were further notified at a later date of his mental condition. We were collectively agreed that any thought on the part of the State to cause this man to forfeit his life would be unjust. It would be unfair. By the same token we were collectively agreed that any course on our part which would assist in having him returned to society would be equally unfair."

No contention is made that petitioner was in fact insane at the time the pleas were made, or that he failed to understand the nature and object of the proceedings against him. Nor is it disputed that, in form at least, the usual constitutional safeguards were observed. Petitioner was represented by counsel of recognized ability and experience, and

he was advised by the court of his right to trial by jury, he was admonished as to the possible consequences of his pleas. It is insisted, however, that beneath the surface of formal regularity, the combination of circumstances to which petitioner was subjected in effect deprived him of any substantial choice in the matter; and that his attorneys, through a mistaken conception of public duty, failed to take advantage of the defense of insanity, but advised pleas of guilty in order to avoid any chance of petitioner returning to society.

Of course the search of petitioner's living quarters, the incessant and prolonged questioning of petitioner while he was confined to a hospital bed, and the unauthorized use of sodium pentothal and a lie detector, were flagrant violations of his rights. Such conduct on the part of law enforcement officials deserves the severest condemnation, especially in view of petitioner's age and emotional instability, and any conviction obtained as a result of such practices would violate constitutional guaranties of due process of law. If either a confession or a plea of guilty is caused by illegal and coercive conduct on the part of law-enforcement officials, the conviction cannot stand. (*Waley* v. *Johnston,* 316 U.S. 101.) But the issue here is whether the pleas are attributable to the conduct in question. If it is reasonably found that there is no relationship of cause and effect, the fact that illegal acts were committed in order to extract information or confessions from the accused does not warrant setting aside the conviction. (See *Lisenba* v. *California,* 314 U.S. 219.) In the case at bar the finding that the pleas were not the product of any illegal conduct of law-enforcement officials is amply supported by the evidence. The pleas of guilty were not made until more than a month after the occurrence of the acts complained of; and petitioner must be deemed to be aware, through his counsel, that any evidence obtained by unlawful methods could not have been used

against him. It is clear that the antecedent conduct of police and State's Attorney, however much it is to be condemned, had no substantial connection with the pleas of guilty.

It is also contended that the petitioner pleaded guilty because public hostility created by newspaper publicity made it impossible for him to have an impartial trial. Acceptance of the plea under these circumstances is said to be a denial of due process. It is true that newspaper publicity may result in conditions under which a fair trial becomes improbable and that where such conditions are present, a trial held in the locality over objections of the accused may violate due process. (See concurring opinion of Mr. Justice Jackson in *Shepherd* v. *Florida*, 341 U.S. 50.) Unwarranted publicity does not, however, necessarily render unconstitutional a conviction based upon an otherwise voluntary plea of guilty. Here no attempt was made to secure a change of venue or to defer the trial. Instead, the petitioner entered a plea of guilty. The record shows numerous circumstances which would normally lead to a voluntary plea of guilty, prominent among them being the many circumstances indicative of guilt and petitioner's expressed desire to escape the death penalty. Upon this record we are not warranted in differing with the conclusion reached by the trial court that the plea of guilty was not induced by adverse newspaper publicity.

It is maintained on behalf of petitioner that his counsel at the time of his conviction failed to give him their undivided allegiance; that although they were of undisputed competence and integrity they improperly assumed a public responsibility and acted in part from a desire to protect society from petitioner; that petitioner had a good defense of insanity, but his attorneys, from mistaken motives of public duty, prevailed upon him to plead guilty instead of relying upon said defense; and that petitioner was thereby denied due process of law. The evidence shows that peti-

tioner had four attorneys, selected by his parents and himself; that they were capable and of high integrity; and that they unstintingly devoted time and attention to the case, and conferred frequently with petitioner. It is not contended that they misrepresented the law to petitioner, misinformed him as to his rights, or failed to give him sufficient legal advice. The complaint is merely that their recommendation to plead guilty was made from motives of public duty as well as those of duty to their client, whereas their actions should have been governed only by the latter. Although petitioner was young, emotionally unstable and unusually susceptible to suggestions, he was of normal intelligence and able to make his own decisions. To recognize the responsibility of such a person for his own decisions is not to withhold due process. As a general rule, an accused person who retains counsel of his own selection is responsible if that counsel does not faithfully serve his interest; and he cannot contend, on a post-conviction hearing, that he was denied due process of law because his counsel was incompetent or negligent. (*Mitchell* v. *People,* 411 Ill. 407.) Where attorneys frequently consult with the accused, and fully explain his rights and the effect of a plea of guilty, the fact that they advised him to plead guilty does not show inadequacy of representation. *People* v. *Seger,* 405 Ill. 222.

It may be conceded that the circumstances under which the crimes were committed, the opinions of examining psychiatrists, the involuntary disclosures of petitioner while under the influence of sodium pentothal, and other matters in evidence, indicate the presence of an abnormality rendering him unable to control his conduct, and might well have justified a finding that he was not legally responsible for the acts at the time they were committed. But the mere fact that counsel failed to advise their client to defend on such grounds does not amount to a denial of due process. Insanity is a defense to be asserted at the trial as any

other defense; and the decision not to advise such a defense, even if it were a mistake, does not of itself show that the defendant was inadequately represented. Mistakes of counsel will not amount to a denial of due process unless on the whole the representation is of such low caliber as to be equivalent to no representation at all, and to reduce the proceedings to a farce or a sham. (See *People* v. *Reeves,* 412 Ill. 555, 562-563.) The finding of the criminal court against petitioner on this issue is adequately supported by the evidence.

We have thoroughly examined the record and find no error therein. The judgment of the criminal court of Cook County will be affirmed.

*Judgment affirmed.*