UNITED STATES of America ex rel.
William HEIRENS, Petitioner-
Appellant,

v.

Frank J. PATE, Respondent-Appellee.

No. 15797.

United States Court of Appeals
Seventh Circuit.

Dec. 27, 1968.

Rehearing Denied Jan. 22, 1969.

Calvin Sawyier, Chicago, Ill., for appellant.

William G. Clark, Atty. Gen. of Illinois, Philip J. Rock, Asst. Atty. Gen., for appellee, Richard A. Michael, Asst. Gen., of counsel.

Before HASTINGS, SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

 This is an appeal from the denial of a habeas corpus petition. The district court's memorandum opinion denying the petition without holding a hearing has not been reported. Earlier phases of this litigation are reported in 4 Ill.2d 131, 122 N.E.2d 231, certiorari denied, 349 U.S. 947, 75 S.Ct. 876, 99 L.Ed. 1273; [1] 38 Ill.2d 294, 230 N.E.2d 875, certiorari denied, 390 U.S. 1044, 88 S.Ct. 1644, 20 L.Ed.2d 306; and 7 Cir., 401 F.2d 147. For the sake of brevity, the facts will not be restated herein except in connection with the legal issues presented by this petition. We do not need to re-examine all of the questions adjudicated earlier. Woodington v. Mathews, 401 F.2d 125, 126 (7th Cir. 1968).

On September 4, 1946, petitioner was arraigned and pleaded guilty to three charges of murder and to twenty-six charges of burglary, robbery and assault. He thereupon received consecutive life sentences on each of the murder indictments and concurrent sentences on the other charges, to be consecutive to the murder sentences. The court had previously ordered that a panel of three psychiatrists examine the petitioner.[2] One of the three was selected by petitioner's retained counsel, another by the State, and the third by the other two. Their report, which concluded that petitioner was sane and competent to conduct his defense, was discussed by petitioner and his trial counsel before his arraignment and pleas. Before entering judgments on the pleas and before sentencing petitioner, the trial court received the report in evidence, pursuant to stipulation of the parties.

 If there was enough evidence before the trial court to create a bona fide doubt as to petitioner's ability to plead guilty or stand trial, it would have been a denial of due process for the court not to convene a sanity jury sua sponte. Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815. But Robinson is factually different because here the data before the trial judge was not sufficient to raise a bona fide doubt. About a month before petitioner's arraignment, the court directed that three psychiatrists examine the petitioner at the County's expense. The panel was well qualified, one of them being the then president of the American Psychiatric Society. Two of the psychiatrists examined petitioner for five to six hours daily for several weeks, and the third was present during the last week of the examinations. Their unanimous report was in part as follows:

"This patient, in our opinion, is not suffering from any psychosis, nor is he mentally retarded; he has average intelligence, he has a deep sexual perversion and is emotionally insensitive and unstable. He has sufficient intelligence to understand the nature and object of the proceedings against him. He rightly comprehends his own position in regard to these proceedings and has sufficient mind to conduct his defense in a rational and reasonable manner. He has repeatedly stated to us that he has always been aware of the nature and purpose of his acts, which are the basis of the present proceedings against him.

\* \* \* \* \* \*

"The quality of intellect was carefully tested and he was found to have an intelligence quotient of 110, an average figure. The Rorschach test was used and failed to reveal any psychosis. At the Illinois Neuropsychiatric Institute several electroencephalographic

---

1. In May 1964, the Supreme Court of Illinois denied a petition for a writ of error in an unreported memorandum order. Certiorari was denied. Heirens v. Illinois, 379 U.S. 868, 85 S.Ct. 140, 13 L.Ed.2d 71.

2. A somewhat similar procedure was employed in Hahn v. United States, 178 F.2d 11, 12 (10th Cir. 1949).

tracings were taken and found completely normal." [3]

This report was the only evidence that the trial judge had before him as to defendant's mental competence at the time he pled guilty, whereas in Pate v. Robinson four defense witnesses expressed the opinion that Robinson was insane at trial time. See 383 U.S. at p. 383, 86 S.Ct. 836. Since no evidence raised a bona fide doubt as to petitioner's competence to stand trial or plead guilty, the trial judge was not required to empanel a jury and conduct a competency hearing. Petitioner's reportedly exemplary prison behavior is consistent with the examining panelists' conclusions that he was not psychotic.

In an effort to fall within the shelter of Pate v. Robinson, petitioner states that the State's Attorney withheld from defense counsel and from the trial court the views of the psychiatrist who conducted a June 29, 1946, interview of petitioner after injecting him with a sodium pentothal solution. That specialist, Dr. Roy R. Grinker, advised the State's Attorney that petitioner was then a "disassociated, psychotic schizophrenic," but he later admitted that he did not know petitioner's mental condition on January 6, 1946 (the day before the murder of Suzanne Degnan) or on August 12, 1946, when the panel of psychiatrists commenced their examination of petitioner. Grinker never reported on petitioner's September 1946 competence to stand trial or to plead guilty or whether he knew right from wrong under the then Illinois sanity tests.[4] His examination of petitioner lasted only from one to two and a half hours, whereas the later panel examination by three recognized experts lasted for several weeks, without the use of sodium pentothal, and was completed just prior to arraignment. We cannot say that Dr. Grinker's earlier views, if known to the trial court, would have compelled the convening of a sanity jury. Moreover, since petitioner pleaded guilty after having been found competent by the panel of psychiatrists (with whom the trial judge agreed[5]), he waived an insanity defense. See United States ex rel. Smith v. Baldi, 344 U.S. 561, 566–568, 73 S.Ct. 391, 97 L.Ed. 549; Lynch v. Overholser, 369 U.S. 705, 719–720, 82 S.Ct. 1063, 8 L.Ed.2d 211; Goldstein, The Insanity Defense, 184–188 (1967). This is especially true here where experienced defense counsel decided not to

---

3. In the Illinois post-conviction proceedings, one of the three reporting panelists testified that petitioner was legally sane and could plead to the charges and cooperate with his counsel. Another panelist testified that petitioner was neither psychotic nor suffering from mental illness. Their testimony related to the August-September 1946 period. The third panelist was not a witness.

4. See United States v. Shapiro, 383 F. 2d 680 (7th Cir. 1967) (en banc); United States v. Williams, 372 F.2d 76 (7th Cir. 1967), certiorari denied, 389 U.S. 880, 88 S.Ct. 112, 19 L.Ed.2d 172; Comments of the Joint Committee to Revise the Illinois Criminal Code, 38 Smith-Hurd Ill. Ann.Stats. § 6–2, at p. 215. The Grinker diagnosis was noted by the Illinois Supreme Court, but it observed that "No contention is made that petitioner was in fact insane at the time the pleas were made, or that he failed to understand the nature and object of the proceedings against him" (4 Ill.2d at pp. 136, 140, 122 N.E.2d at p. 237).

5. Petitioner's counsel conceded at the oral argument that the trial court decided petitioner was mentally competent to plead guilty. Because of the death of one of the court reporters and because the transcript of the abstracted September 4–5, 1946, trial proceedings has been lost, the complete text of the trial court's remarks is not available. However, the same judge heard the 1952 post-conviction petition and reviewed his own notes of the trial proceedings before ruling upon that petition. The court noted Dr. Grinker's belief that "petitioner was a schizophrenic with a dual personality" at the time of his June 29, 1946, sodium pentothal examination. In denying relief, the court must have considered Dr. Grinker's post-conviction testimony as not negating petitioner's competency to plead guilty. It is therefore apparent that the earlier disclosure of the Grinker diagnosis would not have caused the court to reject the guilty pleas in 1946. Cf. Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L. Ed.2d 737.

utilize an insanity defense in view of the panel's report. Furthermore, after many discussions of the possibility of raising such a defense, on July 26, 1946, petitioner directed his counsel to arrange instead for a life sentence in return for his disclosure of his involvement in the crimes.

Petitioner next argues that his guilty pleas were coerced by the conduct of the police, the State's Attorney and the press. His principal reliance is on United States ex rel. Perpiglia v. Rundle, 221 F.Supp. 1003 (E.D.Pa.1963). Perpiglia confessed to the police seven or eight days after prolonged coercion while in their custody and before he had secured counsel. In the present case, counsel was retained by petitioner's parents on Friday, June 28, and first saw petitioner on Monday, July 1, 1946. No confession had been made to the police prior to the retention of counsel. In fact, petitioner's confession to the State's Attorney did not occur until August 6.[6] Because of the marked dissimilarity in facts, the *Perpiglia* case does not warrant the issuance of the writ of habeas corpus here. This is not a case involving an ignorant and impoverished defendant, unequipped to assist in his own defense or unadvised of his legal rights. This petitioner was well educated and came from a family of means who were able to afford and did retain seasoned and respected counsel shortly after his arrest. He evidenced a shrewd awareness of the advantage to be gained by dissembling. All those who examined him, including Dr. Grinker, noticed a marked tendency to malinger. Within a month of his arrest, with the knowledge of the State's case against him and with the advice of his parents and counsel, petitioner decided to plead guilty in order to avoid the electric chair, which was his objective throughout. By obtaining life sentences, he achieved his "desire [not] to take the chance of being electrocuted."

Petitioner claims that the guilty pleas were coerced by the State's Attorney's retreat from his original agreement to recommend only concurrent life sentences. The record discloses that the State's Attorney's final decision to recommend consecutive life sentences (to be followed by concurrent sentences on the lesser charges, consecutive to the murder sentences) was made known to petitioner by his counsel before his August 6th confession, thus refuting the coercion claim. Cf. Rogers v. Wainwright, 394 F.2d 492 (5th Cir. 1968). The testimony shows that the increase in the recommendation was prompted by the State's Attorney's displeasure at petitioner's refusal to confess on July 30, rather than to force the August 6th confession or the guilty pleas. Petitioner received the very sentences for which he had bargained.

Likewise, the clamor in the public press about these crimes cannot be deemed responsible for the guilty pleas. Petitioner was arrested on the evening of June 26, and he admitted his connection with the Degnan murder when he first saw his counsel on July 1. There has been no showing that anything that previously appeared in the press caused him to make that admission. Further admissions of guilt were made to counsel commencing July 7, again without a showing that the press motivated them. His counsel testified at the post-conviction hearing that the newspaper reports had little or nothing to do with his advising guilty pleas. He added: "I did not tell Heirens the newspaper accounts of his arrest and his pending case. Often I acquired information from the press about which I would inquire of him, but not as having seen it in the newspapers."

Although not attacking the competency of petitioner's counsel, petitioner now implies that the guilty pleas would not have been made if his counsel were fully loyal. This contention cannot be

6. There is testimony, credited by the trial judge at the post-conviction hearing, that this confession was voluntary. Petitioner's June 29 sodium pentothal statements did not admit his commission of the crimes, and his counsel properly advised him that such illegally obtained evidence could be suppressed.

sustained. From the day of their first meeting on July 1, his retained counsel knew that petitioner was guilty. These admissions of guilt were confirmed on July 7, and petitioner started confessing to counsel on July 15 or 16, culminating in a written confession to counsel, signed on July 26. Knowing of petitioner's guilt and having been advised by Dr. Harry Hoffman, the psychiatrist consulted by counsel, in several July 1946 conferences that petitioner's abnormalities "were insufficient in law to constitute an insanity defense," counsel concluded that petitioner had no defense to the charges. His only recourse, he thought, was to recommend guilty pleas in return for the State's Attorney's agreement not to recommend the death penalty for these crimes. Since trial counsel's decision to recommend entering guilty pleas was in petitioner's best interest, it is unfair to ascribe this recommendation to a conflict in interest caused by newspaper pressure (see 4 Ill. 2d at p. 142, 122 N.E.2d 231). Cf. Whitus v. Balkcom, 333 F.2d 496 (5th Cir. 1964), certiorari denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343.

In the 1952 post-conviction proceedings, petitioner made similar coercion arguments to the trial judge who denied relief, stating:

"The Court finds in particular that petitioner's counsel did not coerce him into confessing, re-enacting crimes of which he was not guilty or into entering pleas of guilty. Furthermore, the record shows that he was warned by the Court as to the consequences of his pleas and persisted in them. There is no question but that he was represented by counsel who were competent and experienced and did the very best they possibly could for him under the circumstances. He told his counsel he had no defense."

7. Thereafter, the Supreme Court of the United States denied certiorari. 349 U.S. 947, 75 S.Ct. 876, 99 L.Ed. 1273. In 1967, the Illinois Supreme Court saw no reason to reconsider its prior rulings (38

These arguments were renewed in the Supreme Court of Illinois, which unanimously held:

"In the case at bar the finding that the pleas were not the product of any illegal conduct of law-enforcement officials is amply supported by the evidence. The pleas of guilty were not made until more than a month after the occurrence of the acts complained of; and petitioner must be deemed to be aware, through his counsel, that any evidence obtained by unlawful methods could not have been used against him. It is clear that the antecedent conduct of police and State's Attorney, however much it is to be condemned, had no substantial connection with the pleas of guilty." (4 Ill.2d at pp. 141–142; 122 N.E.2d at p. 237.)[7]

Likewise, in denying this habeas corpus petition, the district court held that petitioner's guilty pleas were "intelligent and voluntary." Our independent review of the record does not impel any disagreement with that conclusion.

Finally, we find no error in the district court's refusal to hold an evidentiary hearing on the questions raised in the petition. None of the criteria set forth in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, as substantially codified in 28 U.S.C. § 2254(d), is applicable here. The facts on which we place reliance were developed fairly and conscientiously by the Illinois courts in the post-conviction proceedings. Surely no evidentiary hearing which might be undertaken today, some twenty-two years after the events took place, could be expected to produce more reliable or extensive findings on which to base relief.

Therefore the judgment is affirmed.

SWYGERT, Circuit Judge (dissenting).

With all due respect, the majority's treatment of the questions presented in

Ill.2d at p. 301, 230 N.E.2d 875), and the United States Supreme Court declined review for a third time (390 U.S. 1044, 88 S.Ct. 1644, 20 L.Ed.2d 306). See note 1, *supra*.

454

this appeal is one in which I am unable to concur.

If I read the court's opinion correctly, the majority says in essence that because the questions have been fully canvassed by the Illinois courts on three different occasions and because certiorari has thrice been denied by the Supreme Court, we need not re-examine the facts. This approach is erroneous in light of the provisions of 28 U.S.C. § 2254 which, although directing that a federal court accord presumptive validity to prior state court determinations, in no way require that a federal court treat those determinations as irrebuttably correct. This latter unwarranted emphasis given by the majority to the discretely selected—indeed, slanted—facts utilized by the Illinois courts induced this court, I believe, to reach a result inconsistent with constitutional principles and fundamental due process. As for the denials of certiorari, these are unimportant. "Our denial of certiorari in habeas corpus cases is without substantive significance." United States ex rel. Smith v. Baldi, 344 U.S. 561, 565, 73 S.Ct. 391, 393, 97 L.Ed. 549 (1953). A fresh recital of the essential facts is necessary.

On January 7, 1946 Suzanne Degnan, age six, was kidnapped from her home on the south side of Chicago. A ransom note, which was found by the child's father, was the only trace left by her abductor. Suzanne's dismembered body was later discovered in a sewer catch basin. With the unbridled encouragement of the press, one of Chicago's most sensational manhunts commenced.

On June 26, 1946 the Chicago police captured William Heirens, a seventeen-year old youth, shortly after he had committed a burglary on the city's north side. While scuffling with an officer at whom the petitioner had pointed a gun, young Heirens was hit on the head with three flowerpots by another officer. Still unconscious, the petitioner was taken to a hospital where his head wounds were mended. Thereafter he was transferred to the hospital section of the House of Correction.

From the time of his arrest, the petitioner was suspected of committing the Degnan murder. The day after his apprehension he was interrogated at length by Chicago police and a first assistant State's Attorney, Wilbert F. Crowley. The petitioner, seemingly semiconscious and in pain, refused to answer any questions.

On June 28 petitioner's fingerprints were compared with those found on the Degnan ransom note. The police concluded that there was sufficient similarity between the petitioner's fingerprints and those on the ransom note to establish their identity. Thereafter, the police joined by members of the State's Attorney staff began to question the petitioner. After interrogation which extended throughout the night, he was permitted to sleep for four hours. The petitioner appeared to be suffering from amnesia and refused to answer any further questions.

On the following day the police officers resumed their interrogation; however, on account of the petitioner's continuing irrational behavior, the State's Attorney, William J. Tuohy, requested two Chicago doctors to examine the petitioner and determine whether he had suffered some brain injury which prevented him from answering the questions. After a neurological and verbal examination, Doctors William Haines and Francis Gerty reported that in their opinion the petitioner was malingering. Dr. Gerty suggested, in addition, that the petitioner could be given an injection of sodium pentothal for a definitive determination and that Dr. Roy R. Grinker was qualified to conduct a psychiatric examination of the suspect. Upon being contacted, Dr. Grinker discussed use of the drug with Tuohy and asked whether the petitioner's consent had been obtained for a sodium pentothal injection. He was told that no consent had been given. That the suspect's permission had not been granted or even sought was disquieting to Dr. Grinker according to his subsequent testimony: "I remember very well that there was a struggle with

myself about this but I felt that Mr. Tuohy was the State's Attorney, the people's attorney, my attorney, and therefore if he asked me to determine the mental status of this boy I should go ahead, which I did."

Accordingly, a sodium pentothal injection, which rendered the petitioner unconscious, was administered. Later, after he was aroused to a level where he could communicate, he was questioned concerning his past life and various crimes, particularly the Degnan murder. He readily gave details of that murder and also of numerous burglaries. Besides Doctors Grinker and Haines, State's Attorney Tuohy, his assistant Crowley, and others, including a stenographer, were present during the course of the interrogation. The petitioner ascribed the crimes in which he was implicated to a friend "George" who forced the petitioner to plan and commit the crimes. Dr. Grinker concluded that "George" was actually Heirens despite the fact that the petitioner believed "he did none of these things that George had done * * * and * * * was constantly trying to prevent George from doing those things."

After the petitioner had regained consciousness, he asked, "What did I say? What did I say?" Crowley replied, "Why, I think you said all that I think we have to know." The doctors who participated in the truth serum interrogation boasted to newspaper reporters that the results were "miraculous." Dr. Grinker reported to Tuohy that, although the petitioner was malingering to some extent in refusing to answer questions, "the major factor developed under the pentothal was that the actions of Heirens were not those of the malingerer but those of a mentally sick boy." The doctor also related that Heirens "was a disassociated psychotic schizophrenic," that is, "a mental disease characterized by a splitting of personality, in which very frequently one aspect of the personality may not be aware of the other and may not be in communication with the other."

On June 30, a lie detector test was administered to the petitioner without his consent. Later the same day, he asserted his desire to make a statement and requested to see a police captain. The State's Attorney, his assistant, and a court reporter were called. After several hours of questioning Heirens admitted knowledge of the Degnan murder and other crimes, but attributed them to George Murman, the friend whom he had previously identified while under sodium pentothal.

The following day, a habeas corpus petition was filed on behalf of the petitioner by two lawyers the petitioner's parents had retained. The lawyers met the petitioner for the first time in the courtroom on return of the writ. Despite the fact that the court gave the police twenty-four hours in which "to book" the petitioner, one newspaper overzealously reported that the "police were given until noon today to exact a confession from the youth."

Two days later, the petitioner, having been formally accused during the interim with three assaults and a number of burglaries, was bound over to the grand jury, which subsequently returned a number of indictments charging the petitioner with the murders of Suzanne Degnan, Frances Brown, and Josephine Ross, and twenty-six other crimes, including various burglaries, robberies, and assaults.

From the moment that the petitioner was arrested on June 26 until he finally pleaded guilty on September 4, the Chicago newspapers indulged in excessive and inflammatory coverage of the Degnan murder and Heirens' involvement. Lurid, sensational stories and pictures concerning the case were regular features. All of the State's Attorney's evidence against the petitioner was furnished to the press. Further, the newspapers printed at length the details of the petitioner's questioning while in police custody. The reporters searched for clues and assumed the role of prosecutors. This unparalleled press coverage

generated an atmosphere where the only concern of the prosecutor and defense counsel was whether a public confession of his crimes would be elicited from Heirens and whether he would receive a promise enabling him to escape the electric chair.

Following the return of the indictments, while the press talked about a "deal" and headlines appeared announcing the fact that the petitioner was going to confess his crimes to the State's Attorney, the petitioner's counsel and the State's Attorney agreed to a public confession. On the appointed day the prosecutor's office, crowded with photographers and reporters, greeted the petitioner and his counsel's arrival. Surprisingly, and much to the embarrassment of the prosecutor, the petitioner upon being asked a specific question with reference to the Degnan murder replied that he "did not remember." Tuohy thereupon altered the conditions for his deal, demanding three consecutive life sentences (rather than concurrent ones) in exchange for the petitioner's escape from the electric chair.

Although prosecutor Tuohy terminated the confession interview when the petitioner said that he "did not remember," Heirens' counsel attempted to persuade their client to go through with the confession and even implored his parents to pressure their son into making a confession. That day the newspapers carried headlines, "Heirens Balks," and "Heirens Won't Talk—His fine attorneys and his parents * * * pleaded with him, but to no avail."

Petitioner's counsel publicly expressed "amazement" at his refusal to talk. The following day the petitioner's attorneys again talked with him. One attorney testified that, "I told Heirens that I was provoked and he had no right to embarrass me; that he could follow whatever course he wished but I insisted that I know what was going on." The petitioner testified that his attorney told him that he could never expect to have his freedom and that "it looked very likely that I would get the electric chair."

The petitioner's much heralded public confession was again announced in the press for August 6. On that day, with news reporters and photographers packed in an outer room, the petitioner was brought to the State's Attorney's office. Heirens began a confession which, as extracted from him, was handed in relays to reporters outside the prosecutor's door. The lengthy confession was printed verbatim in all the Chicago newspapers.

A part of the deal between the State's Attorney and defense counsel was that a mental examination of the petitioner would be conducted by a three-member panel of psychiatrists to determine whether Heirens was competent to enter the bargained for guilty pleas.

Before his confession, the petitioner's counsel stated to the press that a psychiatric examination would be made "prior to any plea on the murder indictments" and they "emphasized that the examination was to acquaint the court with the youth's psychiatric background, and was not scheduled with the hope of Heirens being found insane." The record reveals that this announcement was made in light of the fact that the defense counsel had previously conferred with Dr. Harry R. Hoffman, a State psychiatrist, who, according to the attorney, said that although "the symptoms [of Heirens] * * * may show an abnormality they were insufficient in law to constitute an insanity defense." Notwithstanding Dr. Hoffman's unsympathetic conclusion regarding Heirens' lack of sanity, defense counsel selected him as their representative on the three-man panel. The State's Attorney chose Dr. Haines who had earlier diagnosed the petitioner as malingering, and these two doctors selected Dr. Foster Kennedy, a neurologist, as the third member of the panel. Dr. Hoffman testified about Dr. Kennedy's qualifications as follows: "Dr. Kennedy was of the school of psychiatry that might be referred to as organic psychiatry as distinguished from Freudian analysis. Dr. Grinker is of the Freudian school. Dr.

Haines and I belong to the school followed by Dr. Kennedy."

The psychiatrists' report was addressed to the question of the petitioner's sanity at the time of the trial. Because the psychiatrists followed non-Freudian methods of analysis, it is not surprising that their report concluded that the petitioner "has sufficient intelligence to understand the nature and object of the proceedings and has sufficient mind to conduct his defense in a rational and reasonable manner."

Apart from the various psychological and physiological tests which were made to support the foregoing conclusion, most of the report consists of the transcript of psychiatric interviews with the petitioner. Even a most casual reading of these interviews by a disinterested person would indicate that, if the petitioner was not suffering from a severe mental illness, at the very least a substantial doubt existed as to his sanity. The report, for example, states that the petitioner had scrawled on one of the murder victim's apartment wall, "For Heaven's sake catch me before I kill more. I cannot control myself." The report's concluding line read that the petitioner "is unstable, and hysterically unpredictable, and most of his actions can be swayed from time to time by the suggestions coming from his environment."

On September 4, Heirens was arraigned in the Criminal Court of Cook County on the indictments. Before entry of the pleas his attorneys asked him whether he was still agreeable to entering pleas of guilty. After being warned of the consequences of his pleas, the petitioner pleaded guilty to the charges. Thereafter a hearing was held at which the petitioner's confessions of the Degnan, Brown and Ross murders, reenactments of those murders, and the psychiatrists' report were received, the testimony of some eighteen witnesses was heard, and stipulations of counsel regarding the burglaries with which petitioner was charged were read into the record. Following this, the State rested, and counsel for the defense stated that

it had "nothing in mitigation" to offer. Thereupon, the court entered judgments of guilty on petitioner's pleas.

Following entry of the judgments, but prior to the imposition of the sentences, statements were made to the court by the State's Attorney and the petitioner's principal attorney. The latter concluded his statement by the following remarks:

I have no memory of any case, certainly not in my time at the bar, when counsel on both sides were so perplexed as to the mental status of an individual and the causes which motivated him to do certain acts. In those cases we both sought psychiatrists in the hope that they might aid us.

*I must confess that at this time there exists in my mind many doubts as to this defendant's mental capacity for crime; and I believe doubt must exist in our minds* as to just what the relation of cause and effect was, and how he could, in a manner so devoid of feeling, do the acts here charged and upon which the plea has been guilty.

On acquiring knowledge, your Honor, of the facts we were further notified at a later date of his mental condition. We were collectively agreed that any thought on the part of the State to cause this man to forfeit his life would be unjust. It would be unfair. By the same token we were collectively agreed that any course on our part which would assist in having him returned to society would be equally unfair. (Emphasis added.)

Upon the completion of these remarks, the court immediately imposed sentence on the petitioner.

The majority recognizes that the validity of the petitioner's due process claim depends upon whether the trial court had before it sufficient evidence to create a bona fide doubt regarding both Heirens' competency to stand trial and his sanity in general. Aside from constitutional requirements Illinois law provided in 1946 as it does now that, "If before a trial, or after a judgment has

been entered but before pronouncement of sentence * * * the court has reason to believe that the defendant is incompetent the court shall suspend the proceedings and shall impanel a jury to determine the defendant's competency." Ill.Rev.Stat.1967, ch. 38, § 104–2. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), made it clear that a defendant is constitutionally entitled to a hearing on the issue of his competency to stand trial. That case further held that "where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a sanity hearing" pursuant to the Illinois statute. Id. at 385, 86 S.Ct. at 842.

Although obviously the facts regarding Heirens' competency were different from the facts in Robinson, they are sufficiently analogous so as to have required an application of the rule laid down in Robinson. In my opinion an objective test of the relevant facts demonstrates that the trial court should have entertained a reasonable doubt as to Heirens' competency and acted accordingly. The duty imposed on the trial judge could not be delegated to the defendant or his counsel.

The majority, in concluding that the psychiatric panel's report "was the only evidence that the trial judge had before him as to defendant's mental competence at the time he pled guilty," overlooks the total circumstances concerning Heirens' mental state of which the trial judge was aware before the petitioner's guilty pleas were accepted; and to say, as the majority does, that there was "no evidence * * * [of] a bona fide doubt as to petitioner's competence to stand trial or plead guilty" is unwarranted in light of the uncontroverted facts.

What was the evidence of Heirens' mental state at the time his pleas were entered? The facts that have heretofore been outlined are replete with instances of abnormal behavior which could only have raised substantial doubt as to Heirens' criminal responsibility. That the trial judge in collaboration with Heirens' counsel and the State's Attorney's office felt it incumbent to impanel a team of psychiatric experts is conclusive indication of the fact that Heirens' sanity presented a question not free from doubt. The facts surrounding his apprehension, his behavior while incarcerated prior to the date of trial, and especially his own lawyer's confession of uncertainty made at the time of sentencing corroborates my belief that as a matter of law a substantial doubt existed regarding Heirens' sanity. The Grinker report, although apparently withheld from the trial judge by the State's Attorney, allows no other conclusion.

The majority asserts that, since Heirens was found competent by the psychiatric panel, his guilty plea waived his right to subsequently raise the insanity defense. This principle of law is not substantiated by the cases cited in the majority opinion. To me it is morally and legally repugnant to hold that a questionably sane individual by entering a plea of guilty which may be without meaning to him thus waives forever the opportunity to have his incompetency established. The right of an insane person not to be tried and convicted under our system of justice is basic and is essential to insure the preservation of his eighth amendment's protection against cruel and inhuman punishment. The waiver of such a fundamental right where a guilty plea has been entered is surely contrary to the rationale of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357 (1938).

The case presents the picture of a public prosecutor and defense counsel, if not indeed the trial judge, buckling under the pressure of a hysterical and sensation-seeking press bent upon obtaining retribution for a horrendous act. The State's Attorney and defense counsel usurped the judicial function, complying with a community scheme inspired by the press to convict the defendant without his day in court. The proceeding on September 4, at which the defendant en-

tered his pleas of guilty and was sentenced, was in reality a post-mortem of a prior public trial conducted by and in the press. Such a spectacle does little to inspire confidence in our judicial process.

My dissent does not mean that I think Heirens did not commit the terrible wrongs charged against him or that he should have been turned loose. The only proposition I urge is that if Heirens appeared to be incompetent, as the facts indicate, the question of competency should have been resolved in accordance with law, and if adjudicated incompetent, he should have been hospitalized as a dangerously insane person rather than incarcerated as he was as a sane person found guilty of criminal acts.